TAYLOR ET AL., INDEPENDENT COMMITTEE, *v.*
STANDARD GAS & ELECTRIC CO. ET AL.

No. 312.   Argued January 5, 1939.—Decided February 27, 1939.

*Mr. Jason L. Honigman.*for petitioners.

*Mr. Nathan A. Gibson,* with whom *Messrs. Wilbur J. Holleman, A. Louis Flynn,.*and *Jacob K. Javits* were on the brief, for Standard Gas & Electric Co.; *Mr. James F. Oates, Jr.,* with whom *Mr. William P. Sidley* was on the brief, for the Reorganization Committee; and *Mr. George S. Ramsey,* with whom *Mr. Villard Martin* was on the brief, for Greis, Trustee, respondents. *Mr. W. F. Semple* submitted for Deep Rock Oil Corp., respondent.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The question presented is whether the District Court abused its discretion in approving the compromise of a claim by a parent against a subsidiary corporation and a

plan of reorganization based upon the compromise, in proceedings under § 77B of the Bankruptcy Act.[1] The Circuit Court of Appeals, by a divided court, approved the District Court's order.[2]

The petitioners are a committee for the protection of preferred stockholders. The respondents are the trustee of the debtor, Deep Rock Oil Corporation (a Delaware corporation whose business was that of producing, refining, and selling gasoline, oil, and other petroleum products, from lands located in Oklahoma, Kansas, Texas, and Arkansas), a reorganization committee, representing note-holders and certain holders of preferred stock, and Standard Gas and Electric Company, which owns practically all of the common stock of the debtor, claiming as a creditor.

The debtor was organized in 1919 to take over the properties then being operated by one C. B. Shaffer.[3] Standard Gas & Electric Company, hereinafter called Standard, then had investments in various utility properties but had never been interested in oil. Byllesby & Company, hereinafter called Byllesby, an investment banking corporation which controlled Standard, entered into a contract with Shaffer whereby he was to organize the debtor corporation and to be paid by that corporation for his properties $15,580,000 made up of cash, a note, and preferred and common stock of the company. Byllesby agreed to purchase $11,000,000 par value of first mortgage bonds of an authorized issue of $15,000,000, $5,000,000 par value of preferred stock, and 120,000 shares of common stock, par $1, for $15,200,000 in cash, to be applied by the company to the cash payments to be made to Shaffer and for working capital.

---

[1] U. S. C., Tit. 11, § 207.

[2] *Taylor* v. *Standard Gas & Electric Co.*, 96 F. 2d 693.

[3] The corporate name was Shaffer Oil & Refining Company. This was changed in 1931 to Deep Rock Oil Corporation. The company will be referred to by the latter name.

Shaffer received for the properties turned over by him 80,000 shares of common stock, 50,000 shares of $100 par preferred stock, $9,500,000 in cash and a note of Byllesby and Standard for $1,000,000. In fact $12,000,000 of the first mortgage bonds were underwritten by a syndicate formed by Byllesby and sold to the public. The result of the above transactions was to leave Deep Rock with approximately $6,700,000 of cash. Shortly thereafter the remaining $3,000,000 of bonds were pledged to secure Deep Rock's notes for $2,000,000. From its organization Deep Rock was, most of the time, "two jumps ahead of the wolf," as one of Standard's officers testified. The common stock went into a voting trust which gave Standard and Shaffer equal control. Shaffer undertook the management of the properties and business. After two years Standard became dissatisfied with Shaffer's management and he severed his connection with the company selling his common stock to Standard and surrendering to Deep Rock 50,000 shares of preferred stock which was cancelled.

Thenceforward the debtor was under the complete control and domination of Standard through ownership of the common stock. Standard's officers, directors, and agents always constituted a majority of the Board. The remaining directors were operating officers or employes of Deep Rock who had been employed on behalf of Deep Rock by Standard or the Byllesby Management Corporation, hereafter called Management Corporation, a wholly owned subsidiary of Standard, or were under the complete control of Standard. A majority of Deep Rock's officers were officers or directors of Standard or of the Management Corporation, or of both. The officers of the debtor, who were chosen for their technical or business experience in the oil industry, although allowed some discretion in the matter of development and operation of the oil properties, reported to and were always subject to the direction of officers and directors of Standard. All

of the fiscal affairs of the debtor were wholly controlled by Standard, which was its banker and its only source of financial aid.

Deep Rock was placed in the hands of a receiver in March 1933 and the present proceeding under § 77B of the Bankruptcy Act was instituted in June 1934. Standard filed a claim as a creditor in the receivership and in the bankruptcy proceedings, which the receivers and the trustee resisted. The claim was referred to a master, before whom trial lasted many months. All the witnesses were officers, directors or agents of Standard, or its affiliates, and officers of the debtor. All the documentary evidence came from the books and records of Standard and Deep Rock. The basis of claim was an open account which embraced transactions between Standard and Deep Rock from the latter's organization in 1919 to the receivership in 1933. The account consists of thousands of items of debit and credit. The book entries were made under the direction of Standard's auditing department, which supervised the auditing department of Deep Rock, and it is not surprising, therefore, that the books of the two companies agree with respect to all items.

The account contains debits to Deep Rock in excess of $52,000,000 and credits of approximately $43,000,000 leaving a balance shown to be due Standard of $9,342,-642.37, which was the amount of the claim presented. Cash payments by Standard to Deep Rock, or to others for its account, as shown by the books, total $31,804,-145.04. Management and supervision fees paid or credited to Management Corporation amount to $1,219,-034.83. Interest charges by Standard to Deep Rock on open account balances total $4,819,222.07. Rental charges upon a lease to Deep Rock of oil properties owned by a Standard subsidiary but claimed by petitioners to belong, in equity, to Deep Rock, amount to $4,525,000.

Debits by Standard to Deep Rock of the amounts of dividends declared by Deep Rock to Standard, but not paid, reached the sum of $3,502,653. In addition there are hundreds of debits and credits representing other intercompany items.

Two preferred stockholders were permitted to intervene in the proceedings and they joined in the trustee's objections to the claim. Many transactions entered in the account were attacked as fraudulent and it was asserted that as Standard had made Deep Rock its mere agent or instrumentality it could not transmute itself from the status of the proprietor of Deep Rock's business to that of creditor. The hearings before the master were closed, but before he made any report, and as a result of negotiations initiated by the reorganization committee organized at the instance of Byllesby, representing approximately eighty-two per cent. of the noteholders and sixty per cent. of the preferred stockholders of Deep Rock, Standard proposed a compromise of its claim.

The court referred the proposal to the master who reported favorably. The trustee and his counsel also recommended the approval of the compromise, which involved the allowance of Standard's claim at $5,000,000. In contemplation of the approval of this compromise a reorganization of Deep Rock was proposed by the reorganization committee. The plan was based upon the trustee's appraisal of the debtor's assets at $16,800,000, of which $7,300,000 represented net current assets, mainly cash, and the remainder comprised fixed assets valued at $9,500,000. It provided that upon approval of the compromise of Standard's claim, the reorganization would be effected by the formation of a new company which would take over the debtor's assets and would issue $10,-000,000 par value of fifteen year six per cent. income debentures which were to go to the holders of the debtor's unpaid notes of like amount; 25,000 shares of $7 cumu-

lative preferred stock and 520,000 shares of no par common stock, of which the entire preferred stock and 390,-000 shares of common should go to Standard on account of its claim, 80,000 shares of common to the noteholders, and 50,000 shares of common to the preferred stockholders of the old company. Standard's claim to the extent of $3,500,000 was to stand on a parity with the debtor's notes.

In the District Court the petitioners insisted that as the testimony before the master had been closed he should be required to pass upon the provability of Standard's claim and no reorganization plan should be considered until the validity of the claim had been adjudicated. The court, without passing on this demand, refused to approve the compromise or the plan of reorganization. Referring to the 50,000 shares of preferred stock outstanding, the judge stated that somebody had received the money represented by this stock from the public; that the plan in effect wiped out preferred stockholders and that he could not approve any plan which had this effect. In the course of the hearing he stated: "The evidence is overwhelming that Standard ran this company; they officered it; they capitalized it; it is just a child in their hands, and if there ever was a case the law is clear on, it is nothing but an instrumentality, according to the admissions." He indicated, however, that he would approve a plan according Standard a parity with the noteholders for a smaller proportion of its claim allowing the balance on a parity with the preferred stockholders, and suggested that the parties negotiate further in an effort to reach a fair result.

Months later the reorganization committee presented an amended plan which, as modified by the Court, contemplated the compromise of Standard's claim at $5,000,000, as before, and the organization of a new company which should issue $10,000,000 par value of deben-

tures and 520,000 shares of common stock. These securities were to be distributed as follows: The new issue of debentures was to go to the holders of the old notes. In lieu of interest on the old notes accumulated to January 1, 1937, totaling $2,300,000, the noteholders were to receive $1,200,000 in cash and 40,000 shares of common stock; interest accruing subsequent to January 1, 1937, was to be paid in cash. The old preferred stockholders were to receive 100,000 shares of common stock and Standard was to receive for its claim 380,000 shares of common stock. Thus there was allocated to Standard approximately seventy-three per cent., to the old preferred stockholders nineteen per cent., and to the noteholders eight per cent. of the common stock. The District Court permitted the petitioners to intervene and, over their objections, approved the compromise and the plan. A majority of the Circuit Court of Appeals examined the record only to the extent of determining that it was possible that Standard might establish its claim in whole or in part, and concluded that the District Court had not exceeded the bounds of reasonable discretion in granting its approval. One judge thought that the instrumentality rule was applicable; that, under the rule, Standard had no provable claim; and that it was an abuse of discretion to approve the compromise and the reorganization plan. We agree with the conclusion of the dissenting judge, but for different reasons.

The petitioners insist that the appraisal upon which the plan was based was inordinately low and that, for this reason alone, the plan should not have been approved. The appraisal was supported by substantial evidence and the values shown by it were approved and adopted by the District Court and by the Circuit Court of Appeals. We accept the concurrent findings of the two courts that the value of the debtor's assets does not exceed $17,000,000.

As the debentures to be issued to the noteholders, plus the cash they are to get, total $11,200,000, the equity remaining in the property is not over $5,800,000. Standard's share of this equity will be seventy-three per cent., or $4,234,000, and will give it complete control of the new company. The preferred stockholders will receive nineteen per cent. or $1,020,000,—a minority interest without representation on the board of directors. The question is whether, within the bounds of reason and fairness, such a plan can be justified. We think the history of Standard's dealings with Deep Rock requires a negative answer.

Without going into the minutiæ of the transactions between the two companies, enough may be stated to expose the reasons for our decision. As has been stated, Standard came into complete control of Deep Rock in 1921. From the outset Deep Rock was insufficiently capitalized, was topheavy with debt and was in parlous financial condition. Standard so managed its affairs as always to have a stranglehold upon it.

At organization Deep Rock had cash working capital of only about $6,600,000 and a mortgage indebtedness of $12,000,000, the interest and sinking fund requirements of which were nearly $2,000,000 a year. Its assets at that time were appraised at about $16,000,000. Shortly thereafter it created a further note issue of $2,000,000. Upon the acquirement of Shaffer's interest, in 1921, Standard caused Deep Rock to issue short term notes of a part of $3,500,-000. Deep Rock also, between 1921 and 1924, borrowed substantial sums on promissory notes some of which were discounted or subsequently taken up by Standard. So inadequate was Deep Rock's capitalization that, in the period from organization to 1926, the balance due on open account to Standard grew to more than $14,800,000. Standard determined to place some of this indebtedness of Deep Rock with the public. In order to do so it had to

improve Deep Rock's balance sheet. This it did by pur-
chasing 80,000 shares of preferred stock for which it cred-
ited Deep Rock $7,223,333.33. It then bought $7,500,000
face value two year six per cent. notes for $7,273,750,
which were sold to the public through a syndicate organ-
ized by Byllesby. Deep Rock's requirements of addi-
tional capital persisted and, by the spring of 1928, the
open account and a note which Deep Rock had given
Standard for advances totaled over $11,000,000. As the
two-year notes held by the public were maturing, Stand-
ard found it necessary to make a new offering. There
still remained nearly $2,000,000 of first mortgage bonds
outstanding which had to be retired to make an unsecured
note issue salable. Standard, therefore, determined that
Deep Rock's balance sheet must again be put in such shape
that notes could be sold. It accordingly purchased com-
mon stock from Deep Rock to the amount of the then
open balance and commuted 90,000 shares of the preferred
stock, which it held, into common. It caused Deep Rock
to issue $10,000,000 of six per cent. notes which were
sold by a syndicate organized by Byllesby and applied
the proceeds to the redemption of the two-year notes and
the outstanding mortgage bonds. This financing, how-
ever, merely changed the character of Deep Rock's funded
indebtedness and gave it no new working capital. This
$10,000,000 note issue is the one now outstanding. As
before, Deep Rock's resources were wholly insufficient for
its business and the open account began again to build
up so that between February 1928 and February 1933,
the date of receivership, the account had grown to
$9,342,642.37.

No dividends were paid on preferred stock until 1926.
In that and the following year existing arrearages were
paid by Standard, for Deep Rock's account, in the amount
of $1,435,813. Between 1928 and 1931 Standard ad-
vanced Deep Rock, for payment of preferred dividends,
$1,106,706.

During the period between 1926 and 1929 Deep Rock declared dividends on its common stock in a total of $3,064,685.50. Of these dividends $1,946,672 was charged by Standard, as owner of common stock, against Deep Rock in the open account. Standard took new common stock for dividends to the amount of $1,015,437.50 and advanced Deep Rock cash to pay dividends to outside holders of common stock in the sum of $102,576. Against the total of $2,645,095 advanced by Standard to pay Deep Rock's dividends, Standard credited payments received from Deep Rock in the open account in the sum of $927,500.

These dividends were declared in the face of the fact that Deep Rock had not the cash available to pay them and was, at the time, borrowing in large amounts from or through Standard.

About 1922 Standard decided that, in view of the unsatisfactory progress of Deep Rock, earnings must be increased by the acquisition of additional oil properties and by the erection of a modern gasoline cracking plant. Upon recommendation of the operating officials, Standard decided that Deep Rock should purchase the so-called Bradstreet properties, the price of which was $650,000. Of this amount $500,000 was advanced by Standard for account of Deep Rock and $150,000 paid by notes of Deep Rock. Title to the property was taken in the name of J. C. Kennedy, an employee of Deep Rock, as trustee. Kennedy never executed any declaration of trust. Deep Rock charged against him not only the original purchase price of the Bradstreet properties but the moneys thereafter expended in their development and in the acquisition of additional leases, amounting, to October 1, 1925, to $1,033,294.32, much of which represented advances by Standard.

In 1922 Deep Rock conveyed a small portion of its land to R. J. Graf, a Standard official, as trustee. Upon this land Deep Rock erected a new cracking plant at a

total cost of $861,297.79. This expenditure was charged to R. J. Graf, trustee. Again part or all of the sums so expended were advanced by Standard to Deep Rock and charged against the latter.

In 1922 Standard had caused a company to be formed in Delaware known as Deep Rock Oil and Refining Company, intending that it should take title to the Bradstreet properties and the cracking plant. The purpose, as Standard's officers now state, was to keep these assets from going into direct ownership of Deep Rock and thus coming under the lien of its mortgage, so that they could be used as the basis of additional financing. The records of the Refining Company show that its capital stock was issued against the transfer by Kennedy and Graf as trustees of the Bradstreet and cracking properties but there are no corporate records of Deep Rock or of Standard concerning any actual transfer and no book entries of Deep Rock or Standard were made concerning the supposed transfer until December 1925, as of October 1, 1925. At that time, by direction of one Brahaney, the chief accounting officer of Standard, entries were made in Standard's books and those of Deep Rock to evidence the following transaction: Standard assumed the advances made by Deep Rock for improvement of the Bradstreet properties and the cracking plant totaling $1,894,592.11 by crediting Deep Rock with that sum and Refining Company gave its note to Standard in that amount. Deep Rock also credited Kennedy, Trustee, with the $650,000 paid for the Bradstreet properties and Standard assumed this charge. The entire capital stock of Refining Company, evidencing equity ownership in the Bradstreet properties and the cracking plant, was transferred to Standard. Thus, on the face of things, Standard, through ownership of the capital stock of Refining Company, owned and controlled the Bradstreet properties and the cracking plant and put itself in such a position that, without its continued coöperation, Deep Rock could not function.

As at October 1, 1925, but in fact somewhat later, at the dictation of Standard's officials, a lease was executed by the Refining Company to Deep Rock covering the properties in question whereby Deep Rock should, for the first three months, pay $75,000 per month and, for the ensuing four and three-quarters years, pay $50,000 a month to Refining Company as rental. Such rental as was paid by Deep Rock was at once declared by Refining Company as a dividend to Standard and such as was not paid was debited to Deep Rock by Standard in the open account. Under this lease, which expired October 1, 1930, Deep Rock paid, or became obligated to Standard in the total of $3,075,000. During the term of the lease the operations of the leased properties showed a net loss of $30,401.40. The lease further provided that Deep Rock, at its own cost, should make all improvements and additions to the leased property, should make good all depreciation and return the property in the same condition as when leased. Additions to the cracking plant cost Deep Rock, during the term $264,680.51; and there were charged against Deep Rock in alleged fulfilment of its obligations under the lease, taxes of Refining Company and other items amounting to $192,415.91. Meantime, in two letters written bankers in connection with the sale of notes of Deep Rock, the president of Deep Rock, who was also president of Standard, made statements, and warranted their truth, to the effect that Deep Rock owned these leased properties.

In spite of the losses entailed upon Deep Rock by the lease arrangement, Standard dictated its renewal for another term of five years, commencing October 1, 1930, and from that date to the receivership Deep Rock paid, or was debited by Standard with, $1,450,000, as rental and suffered, in the operation of the properties leased, a total loss of $1,584,458.05. During the combined terms of the two leases Deep Rock was charged in the open account

for Standard's subsidiary management corporation in payment of managerial, engineering, and financial advice, $1,020,000.

Immediately after the last and presently outstanding note issue was sold to the public Standard's annual report, for the first time, disclosed its claim to the ownership of the Refining Company properties. At the date of the receivership Standard claimed it owned the Refining Company's properties through stock ownership, and held its note in the amount of $1,894,592.11. The trustee in bankruptcy attacked this transaction as fraudulent and asserted Deep Rock's ownership of all the property represented by the Refining Company's stock free of any indebtedness to Standard in respect of it.

During the whole period from 1919 to the receivership, Standard charged Deep Rock interest at the rate of seven per cent. per annum compounded monthly on the balance shown by the open account. During the entire period the Management Corporation charged Deep Rock with round annual sums for management and supervision of Deep Rock's affairs which totaled $1,219,034.83, all of which Standard assumed and charged into the open account.

It is impossible within the compass of this opinion to detail the numerous other transactions evidenced by the books of the two companies many of which were to the benefit of Standard and to the detriment of Deep Rock. All of them were accomplished through the complete control and domination of Standard and without the participation of the preferred stockholders who had no voice or vote in the management of Deep Rock's affairs.[4]

---

[4] At no time did the charter confer voting power on preferred stockholders, except in case and so long only as the company should be in default in payment of dividends on the preferred for a period of more than six months. At no time did Standard have less than a majority of the voting stock outstanding.

The suggested basis of compromise of Standard's claim needs comment. As has been said, when, in 1928, it became necessary to refinance Deep Rock's note obligations, Standard had to wipe out the enormous and threatening credit balance in its favor on Deep Rock's books. It, therefore, took common stock in payment of the balance. It is said that the compromise figure is reached by disregarding all transactions prior to February 24, 1928, when Standard commuted its then claim, starting fresh from that date, and considering only the items in the account thenceforward to the date of receivership. It is asserted that, during the period in question, Standard paid out, for account of Deep Rock, in cash, $6,850,971.50 and credited Deep Rock against these expenditures $4,475,803.59, leaving a balance of cash advanced of $2,375,167.91, as to which there can be no question; the Bradstreet properties and the cracking plant are to be returned to Deep Rock's ownership by transfer of the stock of the Refining Company and its note now held by Standard. It is asserted that in consideration of this transfer Deep Rock ought to assume the original cost of the Bradstreet properties advanced by Standard ($650,000), plus the amount of the disbursements by Deep Rock upon those properties which Standard had credited to Deep Rock when it took over the Refining Company stock ($1,894,592.11), less rentals charged by the Refining Company to Deep Rock prior to February 24, 1928, which rentals had been absorbed in the settlement by Standard of February 24, 1928 ($1,475,000). This leaves Deep Rock owing on the Bradstreet and cracking plant accounts $1,585,485.18. Simple interest at five per cent. is to be allowed on each of the two sums so ascertained. This brings the claim to approximately $5,000,000. It is said that this computation of the claim eliminates debits to Deep Rock made since 1928 for the fees of Management Corporation, for dividends on pre-

ferred and common stock held by Standard, and for every other questionable item; and that there can be no just criticism of the recognition of Standard's claim in the amount represented by the compromise offer.

Petitioners invoke the so-called instrumentality rule,— under which, they say, Deep Rock is to be regarded as a department or agent of Standard,—to preclude the allowance of Standard's claim in any amount. The rule was much discussed in the opinion below. It is not, properly speaking, a rule, but a convenient way of designating the application in particular circumstances of the broader equitable principle that the doctrine of corporate entity, recognized generally and for most purposes, will not be regarded when so to do would work fraud or injustice. This principle has been applied in appropriate circumstances to give minority stockholders redress against wrongful injury to their interests by a majority stockholder.[5] It must be apparent that the preferred stockholders of Deep Rock assert such injury by Standard as the basis of their attack on the decree below. We need not stop to discuss the remedy which would be available to them if § 77B of the Bankruptcy Act had not been adopted for we think that, by that section, the court, in approving a plan, was authorized and required, as a court of equity, to recognize the rights and the status of the preferred stockholders arising out of Standard's wrongful and injurious conduct in the mismanagement of Deep Rock's affairs.

The section contains a provision new in bankruptcy legislation with respect to the standing of stockholders in corporate reorganization. Subsection (b) provides: "A plan of reorganization . . . (2) may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new

---

[5] Compare *Southern Pacific Co.* v. *Bogert,* 250 U. S. 483.

securities of any character or otherwise; . . ." In the present case there remains an equity after satisfaction of the creditors in which only the preferred stockholders and Standard can have an interest. Equity requires the award to preferred stockholders of a superior position in the reorganized company. The District Judge, we think, properly exercised his discretion in refusing to approve the first offer of compromise and concomitant plan because it partly subordinated preferred stockholders to Standard. The same considerations which moved him to reject that plan required the rejection of the new offer and the amended plan.

Deep Rock finds itself bankrupt not only because of the enormous sums it owes Standard but because of the abuses in management due to the paramount interest of interlocking officers and directors in the preservation of Standard's position, as at once proprietor and creditor of Deep Rock. It is impossible to recast Deep Rock's history and experience so as even to approximate what would be its financial condition at this day had it been adequately capitalized and independently managed and had its fiscal affairs been conducted with an eye single to its own interests. In order to remain in undisturbed possession and to prevent the preferred stockholders having a vote and a voice in the management, Standard has caused Deep Rock to pay preferred dividends in large amounts. Whatever may be the fact as to the legality of such dividends judged by the balance sheets and earnings statements of Deep Rock, it is evident that they would not have been paid over a long course of years by a company on the precipice of bankruptcy and in dire need of cash working capital. This is only one of the aspects in which Standard's management and control has operated to the detriment of Deep Rock's financial condition and ability to function. Others are apparent from what has been said and from a study of the record.

If a reorganization is effected the amount at which Standard's claim is allowed is not important if it is to be represented by stock in the new company, provided the stock to be awarded it is subordinated to that awarded preferred stockholders. No plan ought to be approved which does not accord the preferred stockholders a right of participation in the equity in the Company's assets prior to that of Standard, and at least equal voice with Standard in the management. Anything less would be to remand them to precisely the status which has inflicted serious detriment on them in the past.

*Reversed.*

MR. JUSTICE FRANKFURTER took no part in the consideration or decision of this case.