## In re DULUTH, S. S. & A. RY. CO. et al.

### No. 13310.

District Court, D. Minnesota,
Fourth Division.

Jan. 31, 1945.

Ralph Royall (of Ehrich, Royall, Wheeler & Holland), of New York City, and F. H. Stinchfield (of Stinchfield, Mackall, Crounse & Moore), of Minneapolis, Minn., for petitioner.

Henry S. Mitchell, of Minneapolis, Minn. (Leonard H. Murray, of Minneapolis, Minn., of counsel), for Canadian Pac. Ry. Co.

P. L. Solether, of Minneapolis, Minn., for trustees.

Cleon Headley (of Kellogg, Morgan, Chase, Carter & Headley), of St. Paul, Minn., for Central Hanover Bank & Trust Co. as Trustee.

Reese D. Alsop, of New York City, and Peter Newton Todhunter, of Chicago, Ill. (Hunt, Hill & Betts, of New York City, of counsel), for First Mortgage Bondholders' Committee.

NORDBYE, District Judge.

This matter came before the undersigned, one of the Judges of the above named Court, on the amended petition of the intervener, Louis Lober, for the hearing and determination, as a separate issue, of his claim that the claims of the Canadian Pacific Railway Company be subordinated to the claims of the owners of the first mortgage five per cent bonds of the debtor.

The matter is presented on the facts set forth in the amended petition of the intervener, which are admitted in the amended answer of the Canadian Pacific, and the facts alleged in the amended answer of said company, which are admitted in petitioner's reply, together with copies of certain instruments and documents referred to in said pleadings. A comprehensive statement of facts upon the matters which in part form the basis of this action will be found in McCulloch v. Canadian Pacific Ry. Co., D.C., 53 F.Supp. 534. The following summary will therefore suffice:

The Duluth, South Shore & Atlantic Railway Company (hereinafter called the South Shore) was organized in 1886–1887 by a syndicate. This syndicate acquired the property of the Detroit, Mackinac & Marquette Railway Company running from St. Ignace through the Soo Junction to Marquette, and it also made a contract with certain contractors to construct a new line westward from Nestoria toward Duluth. The preferred and common stock of the Marquette, Houghton & Ontonagon Railroad Company (hereinafter called the M. H. & O.) was also obtained. The result was that the South Shore and the M. H. & O. were provided with substantially identical boards of directors. The two boards of directors, without authority from the stockholders of either company, arranged for a perpetual lease dated April 15, 1887, of the M. H. & O. properties to South Shore. It appears that the rights of South Shore to retain and operate the M. H. & O. properties under this lease were terminable in the event of South Shore's default in the payment of specified minimum rentals, consisting of six per cent dividends amounting to $196,707 per annum on M. H. & O. preferred stock and $320,672 per annum of interest on $4,903,700 of outstanding M. H. & O. bonds. This perpetual lease was subjected to the lien of South Shore's first mortgage dated April 15, 1887, which mortgage also covered certain properties owned by South Shore which were constructed or

to be constructed. The mortgage consisting of $4,000,000 of bonds, hereinafter called Fives, was issued thereunder. In the year 1888, Canadian Pacific acquired a majority of South Shore's capital stock, and ever since that time has caused such stock to be voted in favor of the persons who were elected to South Shore's board of directors. At or about the time the Canadian Pacific obtained stock control of the South Shore, the latter had incurred a short-term floating debt of $1,200,000. By July 17, 1890, this floating debt had increased to $3,733,749, of which $1,764,393 consisted of advances made to South Shore by Canadian Pacific. $878,886 of this floating debt consisted of short-term borrowings which were used to pay rentals under the M. H. & O. lease. It further appears that, in the year 1892, there would mature of the M. H. & O. bonds approximately $1,380,500. In addition, M. H. & O. was indebted to South Shore in the sum of $693,652 for improvements on the properties of the former, and which M. H. & O. was unable to pay. These circumstances, together with other problems confronting South Shore, occasioned the reorganization of South Shore on the following basis: South Shore executed its first consolidated four per cent one hundred year gold mortgage dated July 17, 1890, which provided for the issuance of bonds hereinafter called Fours, for the following purposes, among others: $3,308,000 in exchange for the capital stock of M. H. & O.; $693,652 on account of the improvements made by South Shore on the M. H. & O. properties; and $12,656,000 was to be used in exchange for the outstanding M. H. & O. bonds and the South Shore Fives. As a part of the reorganization, it was agreed between South Shore and M. H. & O. that the perpetual lease was to be abrogated and the M. H. & O. properties were to be conveyed in fee to South Shore in consideration of South Shore's assumption of the payment of all outstanding M. H. & O. bonds, its undertaking to pay the M. H. & O. stockholders, in exchange for their stock, specified amounts, either in Fours or in cash, and its waiver of the claim of $693,652 that South Shore had expended for improvements on M. H. & O. properties. In addition, there was executed a Traffic Agreement between South Shore and Canadian Pacific in which, among other things, South Shore agreed to apply Fours, or the proceeds thereof, to the purpose of retiring, at or before maturity, the outstanding South Shore Fives and M. H. & O. bonds. The Canadian Pacific agreed, on the conditions set forth in said Traffic Agreement, to guarantee the payment of interest on the Fours as fast as they were exchanged for any of said outstanding bonds or which were issued in retirement of South Shore's floating debt hereinbefore referred to. It further provided that, in consideration of Canadian Pacific's undertaking to furnish such guaranties, it was to receive from South Shore $2,000,000 in Fours. The result was that the Fours mortgage became subject to the four outstanding M. H. & O. mortgages as to the property formerly belonging to M. H. & O. and subject to the Fives as to the remainder of South Shore's property.

Thereafter, of the total outstanding issue of Fives, some $184,000 of such bonds were exchanged for Fours and such Fours were guaranteed as to interest by the Canadian Pacific. The holders of the balance of the outstanding Fives apparently were satisfied to hold their present bonds and to collect the higher rate of interest which was paid to them until the maturity of said bonds on January 1, 1937. Prior to such maturity, however, and in the year 1936, it appeared that South Shore's net railway operating income was far short of equaling the interest on its funded debt. It was faced with the maturing on January 1, 1937, of $1,400,000 of M. H. & O. Sixes, which latter bonds had been extended to that date, and $4,000,000 of South Shore Fives. It was apparent in the year 1936 that the company's financial structure had to be reorganized, either in equity or under the Bankruptcy Act. It was under these circumstances that the Traffic Agreement entered into on July 17, 1890, was abrogated in the month of May, 1936, by South Shore and Canadian Pacific, and such abrogation was reflected in an agreement entered into between said parties designated as the Traffic Agreement Supplement. By the Traffic Agreement Supplement, the closure of the Fours mortgage was arranged, and Canadian Pacific was released from its obligation to guarantee any further Fours. On January 2, 1937, a voluntary petition in bankruptcy was filed by the South Shore under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205 and such proceedings have been in effect since that time.

In urging the subordination of the claims of the Canadian Pacific to the claims of the holders of Fives, the petitioner relies pri-

736

marily on the doctrine enunciated in Taylor v. Standard Gas & Electric Co., 1939, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669, and Consolidated Rock Products Co. v. DuBois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. He contends that Canadian Pacific's becoming a party to the abrogation of the Traffic Agreement, by which the right to exchange Fives for Fours was revoked, and its release from its obligations of guaranty, requires the application of the doctrine stated in these two cases.

At the outset, it should be made clear that the petitioner does not contend that Canadian Pacific, as the controlling stockholder of South Shore, in any way mismanaged the latter, or that Canadian Pacific is in any way responsible for South Shore's financial predicament. While Canadian Pacific controlled the election of South Shore's directors, such directors were not identical with the Canadian Pacific's directors, and there is no evidence that the election of the officers or managers of South Shore, or its policies, was controlled or dominated by Canadian Pacific. Morever, there is an absence in the record of any facts or circumstances which even remotely tend to establish that the entering into the Traffic Agreement Supplement was the result of Canadian Pacific's insistence, or that it initiated the suggestion to the South Shore. In fact, the record indicates that the abrogation of the Traffic Agreement was first suggested by the then counsel for South Shore. But notwithstanding these uncontroverted circumstances, the petitioner earnestly urges that the abrogation of the Traffic Agreement, standing alone, is sufficient to point unmistakably to domination by the Canadian Pacific and that its mere participation in an agreement which absolved it from guaranteeing the Fours constituted a breach of fiduciary trust.

In commenting further upon the petitioner's position, reference may be made to the holding of the McCulloch case. While this case is not binding upon the petitioner because he was not a party to that proceeding, nevertheless the views of the Court regarding certain contractual rights of the holders of the Fives should guide it in this proceeding so far as such principles may be applicable herein. In addition, it should be stated that the McCulloch case did not pass upon the question of the alleged domination of the Canadian Pacific, and that issue is not controlled by the conclusions arrived at in that decision. However, in determining whether or not Canadian Pacific acted wrongfully in doing that which it did do in participating in the Traffic Agreement Supplement, it seems quite necessary to review the rights of the parties involved. That is, in the McCulloch case, the Court held that, while the holders of the Fives were third party donee beneficiaries to certain promises contained in the Traffic Agreement, and, as such, could have exchanged their holdings for Fours to be guaranteed by Canadian Pacific, their rights as third party beneficiaries could be rescinded and cancelled in absence of reliance thereon by them. It is not contended herein that any of the holders of the Fives acted in reliance either on South Shore's promise to exchange, or on Canadian Pacific's promise to guarantee the Fours issued in exchange for the Fives. Therefore, we commence with the premise that, in absence of some showing of wrongful domination, fraud, or other unlawful conduct, that which South Shore and Canadian Pacific did in abrogating the Traffic Agreement did not violate any of the rights which the holders of the Fives had obtained as third party beneficiaries. It must follow, therefore, that, in order to justify any doctrine of subordination as enunciated in the cases relied on, there must be some affirmative wrongful conduct or course of unconscionable dealings on the part of the controlling stockholder which gives rise to the equitable principles relied upon. The petitioner summarily characterizes Canadian Pacific's conduct as "strong arm" methods, but he has failed to produce or to refer to any facts or circumstances which justify such bald conclusions. There is no showing here that South Shore was a mere department or agency of the Canadian Pacific. The mere fact that Canadian Pacific was the controlling stockholder of South Shore does not of itself wipe out the corporate entity of the latter company. True, it would not be a violent presumption to conclude that Canadian Pacific was not averse to being released from any further obligation to guarantee the Fours, but such attitude or feeling on the part of the Canadian Pacific does not necessarily indicate that it committed any wrong or was guilty of any unconscionable conduct towards the holders of the Fives. In any event, as far as the present record indicates, that which South Shore did in abrogating the Traffic Agreement of 1890 was prompted by considerations which it

deemed proper and sufficient in view of the impending reorganization which confronted it. Something more is necessary to wipe out the corporate entity of South Shore or to attribute a merger of South Shore and Canadian Pacific than the mere fact of stock control by the latter company. Mere assertions, conclusions, and suppositions cannot be substituted for facts when one asserts that South Shore was a mere instrument of Canadian Pacific.

It is asserted that the agreement of 1936 brought about a depletion of South Shore's assets. But such statement does not square with a realistic view of the facts. As stated in the McCulloch case, at page 547 of 53 F.Supp.: "* * * it must be clear that South Shore's assets have not been depleted by reason of the release of Canadian Pacific's obligation to guarantee the Fours. Any performance of this guaranty would neither diminish the debts nor increase the assets of South Shore. Any amount paid by the Canadian Pacific on this guaranty would constitute a claim against the assets of South Shore. The only effect would be a substitution of creditors. In fact, in Article Sixth of the Traffic Agreement, South Shore promised to repay the Canadian Pacific any amount of interest paid by it as guarantor, with six per cent interest. Moreover, any rights of South Shore to issue new obligations would not constitute an asset of that company."

In analyzing Taylor v. Standard Gas & Electric Co. and Consolidated Rock Products Co. v. DuBois, supra, and in determining whether or not the principles enunciated therein can be applied to the factual situation as evidenced by this record, it is highly significant that counsel for the petitioner frankly conceded in oral argument that Canadian Pacific was not in any way responsible for the financial involvements of South Shore. Moreover, in appraising the conduct of Canadian Pacific, it appears that it waited nearly fifty years for the holders of the Fives to take advantage of the offer of exchange, but instead of embracing the right which is now claimed to be so valuable, the holders of the Fives were content to retain their bonds and did not tender them for exchange, nor did they bring any action to obtain such privilege prior to the termination of the exchange right on January 1, 1937. In this connection, it would be helpful to emphasize the very evident intention of the parties when the Traffic Agreement was entered into. At that time, the South Shore's financial future was indeed hazardous. The obligations under the perpetual lease of the M. H. & O. property were apparently creating an insurmountable burden. Any suggestion that the right of exchange of Fives for Fours, with Canadian Pacific's guaranty, was prompted by a desire of the parties to quiet the objections of the holders of the Fives to the cancellation of the perpetual lease, is without foundation in the record. Anent thereto, the Court stated in the McCulloch case, at page 543 of 53 F. Supp.: "* * * But whatever equity the Fives had in the perpetual lease, it probably was of doubtful value. It must be recognized that the lease was an onerous one to the South Shore. The Marquette bonds of some $1,380,500, which matured in 1892, were prior to the mortgage lien of the Fives. The burden of the lease was undoubtedly one of the factors which induced the plan to obtain a deed to the Marquette properties and the proposed absorption of the liens thereon by the issuance of the Fours, which were to become a lien on the entire South Shore properties. The cancellation of the lease was one of the steps taken to consummate the contemplated consolidation of the entire indebtedness on the South Shore system in one mortgage lien; that is, the consolidation of the outstanding indebtedness into one mortgage lien was one of the principal aims of the refinancing program."

Parenthetically, it may be stated that there is no support for petitioner's assertion that the parties intended that the Fives should not be exchanged for the Fours prior to maturity unless the interest on the Fives was defaulted. Such conclusion is entirely inconsistent with the apparent intent of the parties in promoting the refinancing of South Shore. In other words, the refinancing program could only be successful if the holders of the Fives embraced the offer to exchange their holdings for Fours. That such exchange had to be timely and prompt in order to bring about the desired results seems clear. It need only be noted that, if $4,000,000 of the Fives were exchanged for Fours, there would be a saving of $40,000 per year in interest charges. The anticipated benefit in saving of interest charges did not materialize through the apathy and indifference of

the holders of the Fives. They could not be required to make the exchange. The inducement which was held out to them, to wit, a stable mortgagor by reason of sound financing and the guaranty of their holdings by Canadian Pacific, did not create the attraction to the holders of the Fives which the parties envisaged. During the years which ensued, South Shore paid well over $1,500,000 in interest charges on the outstanding Fives which would have been saved if all of the Fives had been exchanged at or about the time the offer was made. In 1936, therefore, when the bankruptcy of South Shore was inevitable, when upon the happening of that event it would be impossible for South Shore to issue any additional Fours as contemplated, and when it appeared that the refinancing scheme of some forty-six years ago had not to the extent indicated proved successful, the fact that the parties under these circumstances abrogated the Traffic Agreement does not, without more, justify the view that South Shore acted as a mere tool of Canadian Pacific and that the alleged sinister domination of the controlling stockholder caused the abrogation of the right of exchange.

The petitioner has intimated that the situation as presented shifts, or at least places, the burden of proof on Canadian Pacific to justify its participation in the Traffic Agreement Supplement of 1936, and that, in absence of some affirmative justification, it is fair to find that the agreement was entered into as a result of the wrongful domination of Canadian Pacific, and the petitioner suggests that, in reorganization proceedings under Section 77, the Court should be quick to protect any creditor group which may have been deprived of any asset or right belonging to the debtor on the eve of bankruptcy. But the fallacy of petitioner's position seems quite apparent. First, under the showing herein, the South Shore was not a mere department or agency of the Canadian Pacific and the offer to guarantee the Fours by Canadian Pacific was not an asset of South Shore; second, there is no showing which would justify a finding that the holders of the Fives have in any way been injured by any wrongful management, sinister control, or other domination to the prejudice of the creditors of South Shore; and third, if the abrogation of the Traffic Agreement suggests to the Court that the entire relationship between Canadian Pacific and South Shore should be explored so as to deter-

mine whether there has been such wrongful conduct by Canadian Pacific to the detriment of the holders of the Fives, so as to require or justify a subordination of Canadian Pacific's claims, it may be pointed out that there is now pending before this Court a proceeding of that very character by the First Mortgage Bondholders' Committee. This committee has raised objections to the claims of the Canadian Pacific and seeks subordination of such claims to the Fives, not merely by reason of the transaction of May, 1936, but by reason of the entire relationship between Canadian Pacific and South Shore through the years 1888 to the time of bankruptcy. The hearing on the objections to the claims of the Canadian Pacific as interposed by the First Mortgage Bondholders' Committee, which represents a substantial number of the holders of Fives, has been deferred, primarily because of the petitioner's insistence that he should be permitted to present his theory of subordination, which is based primarily on the abrogation of the Traffic Agreement, with nothing more, and his contention that it would be futile to consider the entire relationship of the parties from 1888 to the time of bankruptcy when by reason of the abrogation of the Traffic Agreement, standing alone, the principle of subordination should prevail. The effect of Canadian Pacific's participation in the abrogation of the Traffic Agreement is fully embraced in the objections heretofore made to the Canadian Pacific claims by the First Mortgage Bondholders' Committee.

On the showing made and for the reasons set forth, the Court concludes that the petition of the intervener, Louis Lober, for subordination of the claims of the Canadian Pacific to the claims of the owners of the Fives should be, and is, denied. It is so ordered. An exception to this ruling is reserved.

It should be clearly understood that any views expressed herein as to the rights of the holders of the Fives to obtain subordination of Canadian Pacific's claims in the reorganization of the debtor are expressly limited to the petition now being considered, and in no way control, limit, or prejudice the rights of the First Mortgage Bondholders' Committee in its proceeding wherein it has objected to the claims of the Canadian Pacific and seeks subordination on the grounds hereinbefore referred to. Whether, in equity, in light of the entire relationship between Canadian Pacific and

South Shore since 1888 as may be established in any other proceeding, there should be subordination, in whole or in part of the claims of the Canadian Pacific in the reorganization of this debtor, is a matter concerning which the Court now expresses no final view.