In re CLARK SUPPLY CO., Inc.

## TODD BLDG. CORPORATION v. HELLER.

### No. 9537.

United States Court of Appeals
Seventh Circuit.

Jan. 18, 1949.

Rehearing Denied Feb. 25, 1949.

See also 172 F.2d 254.

Leon Schmidt, of Milwaukee, Wis., for appellant.

Byron J. Hays and Reginald I. Kenney, of Milwaukee, Wis. (Kenney & Hays, of Milwaukee, Wis., of counsel), for appellee.

Before KERNER and SPARKS, Circuit Judges, and LINDLEY, District Judge.

KERNER, Circuit Judge.

The Todd Building Corporation appeals from an order of the District Court confirming an order of the Referee in Bankruptcy directing it to turn over all property in its possession to the trustee in bankruptcy of the Clark Supply Company, Inc.

The order amends title to the bankruptcy proceedings to include the Todd Corporation, orders creditors of Todd to file their claims with the referee, and orders E. H. Clark and B. E. Clark as individuals and as officers of Todd to file schedules of the assets and liabilities of Todd.

The Clark Supply Company, Inc., was adjudicated a bankrupt, and Albert C. Heller was appointed and qualified to act as receiver, and thereafter he was elected as trustee. On May 13, 1947, Heller filed his petition against Clark Climate Control Company, Buda Sales and Service, Inc., and Todd Building Corporation, referred to hereinafter respectively as Control Company, Buda, and Todd, and also against E. H. Clark and B. E. Clark, as officers of those corporations and as individuals, in which he alleged that the Supply Company was one of several commingled and affiliated corporations having the same stockholders and officers; that the assets of the Supply Company had been transferred without consideration to its affiliates, Todd, Control Company, and Buda; and that their affairs were little more than corporate pockets for it. The petition prayed for a restraining order and injunction against the corporate respondents, and against E. H. Clark and B. E. Clark individually, from transferring any assets derived from the bankrupt. The referee issued a restraining order and directed Control Company, Buda, Todd, and E. H. Clark and B. E. Clark, individually and as officers of the corporate respondents, to show cause why the injunction should not be granted. Due service of that order was made upon all respondents. The corporate respondents appeared, but E. H. Clark and B. E. Clark made no appearance in these proceedings. On its voluntary petition Buda was adjudicated bankrupt on June 25, 1947. It was thereafter represented in these proceedings by its duly elected trustee. Todd moved to dissolve the restraining order for lack of jurisdiction, which was denied, and affidavits of traverse to the petition were filed.

While the trial under the order to show cause was limited to injunctive relief, it was understood by all parties, and was so stated by the referee at the outset, that the issue in question was whether the assets of Todd were to be considered, treated and dealt with as the assets of the bankrupt and marshalled by the trustee for the benefit of the creditors of the bankrupt estate. Hearings were had on the issue, before Becker, Referee, which culminated in findings of ultimate facts and conclusions of law by the referee, and which in substance are as follows:

E. H. Clark and B. E. Clark up to December 31, 1945, did business as partners under the name of Clark Supply Company, at which time the partnership was incorporated pursuant to the laws of Wisconsin under the name of Clark Supply Company, Inc. The partnership had several divisions. Among them were Clark Manufacturing Company, E. H. Clark and Associates, Buda Sales & Service, Inc., and Clark Electric Service. Each of these divisions carried on activities which were distinct in character. There were many products and services required in several divisions which were furnished by the others. Each came into being through the promotion, development and financial assistance of the partnership. No segregation was made of the assets or income of these divisions. One set of books was maintained, and all expenses and liabilities incurred were obligations of the partnership.

In August, 1945, the partnership acquired property at 1326–36 West Clybourn Street, Milwaukee, with the expenditure of partnership funds of $44,844.86 and by the assumption of an outstanding mortgage of $46,000. It also acquired land at 233 East Keefe Avenue, Milwaukee, for $15,000. These two parcels were carried on the books of the partnership at a cost value of $59,844.86.

At the beginning of the year 1945 the investment account of the partners with the partnership stood at the sum of $179,466.18. During that year the partners personally withdrew from the partnership $293,346.52, which was more than twice the net earnings of the partnership during that year. This left the partnership with no working capital. The partners did not con-

template closing or terminating any part of their business operations.

These withdrawals from the partnership were made by the Clarks as part of a plan. The general details and objectives of this plan were to terminate the partnership as a medium for the operation of the enterprises; to end the partners' personal liability to the then existing creditors of the partnership; and to form a number of corporations to be fully owned by them and their families and dominated and controlled by them with no other assets than those derived from the partnership. Some of these contemplated corporations were to assume and pay all of the obligations and debts of the partnership and were to carry on the potentially losing divisions of the partnership with little or no working capital. Other contemplated corporations were to receive the valuable property of the partnership at cost of the physical property and were to continue the potentially profitable divisions of the partnership, thereby placing such property, contracts, franchises and profitable business beyond the reach of creditors of the partnership and those who would become creditors of the corporate successors of the partnership while such corporate successors carried out the assigned task of paying the debts of the partnership and served as a credit facility of the favored corporate entities, all of which was to be done with the ultimate objective of preserving diverted assets for the benefit of the Clarks and their families.

In the latter part of 1945 the formulation of the plan had progressed to a point where paid consultants were retained to put the plan into operation. On October 13, 1945, in furtherance of the plan, the Clarks created Todd. They then removed from the assets of the partnership the Clybourn Street property, transferring it to Todd and taking from that corporation therefor its capital stock of $30,000 and its note in the sum of $14,844.86, all of which they issued to themselves, personally. They further removed from the assets of the partnership the Keefe Avenue property and transferred it to Todd, and took from that corporation therefor its note for $15,000 which they likewise issued to themselves.

These notes of Todd totalling $29,844.86, together with stock in Todd in the amount of $12,000, together with other assets of a stated value of $17,031.69, the Clarks placed among the assets of the partnership in substitution for the real estate so removed. The exact amount employed in entering this transaction upon the books of the partnership was a charge to their drawing accounts upon transfer of the real estate, and a credit to their drawing accounts upon the substitution of assets. The stated dollar value of these substituted assets was not the equivalent of the cost of the real estate, but it was such cost less the book depreciation of $958.31.

While Todd has a charter authorizing a capital of $100,000, the Clarks subscribed for only $50,000 therefor and took credit upon Todd's corporate books for $30,000 by reason of the transfers of the real estate. They took the stock in their names, except qualifying shares which they took in the names of their wives, and one share which was issued in the name of Todd Clark, infant son of B. E. Clark. The partnership real estate was the only asset obtained by Todd. Neither E. H. nor B. E. Clark, or members of their families, invested therein any funds or anything of value. Thereafter the Clarks caused entries to be made upon the books of Todd in the form of credits against their stock liability balance of $20,000. This at best was their appraisal of the worth of their services rendered to Todd in the months that followed. No change in stock ownership of Todd has been noted upon the books of that corporation except the transfer of $12,000 of shares to the partnership as above noted.

In December, 1945, the Clarks caused three new corporations to be formed. One of them was the bankrupt, which was chartered on December 19, 1945, with an authorized capital of $250,000—500 shares at $500 each. The partnership, after the exhausting withdrawals of the partners during the latter part of 1945, on the day of the formation of the bankrupt, had assets (including the notes and stock of Todd) valued by the partners on the books of the partnership at the sum of $1,613,723.90 and had debts and liabilities in the amount of $1,613,629.17, or net assets of $94.73.

It was part of the original plan of the Clarks to place a value of $350,000 upon these assets of the partnership which were represented by the book value of $94.73, and to transfer such assets less $100,000 for fully paid shares of the bankrupt in the amount of $250,000. This portion of the plan was abandoned, and instead the Clarks subscribed for $125,000 in stock of the bankrupt which they took in their names, except nominal shares which they took in the names of their wives. No cash or other asset of value was given or transferred by the Clarks for these 250 shares of the bankrupt, other than the partnership assets, valued by them, both in the closing entries of the partnership and the opening entries of the bankrupt, at $94.73.

The assets transferred to the bankrupt included everything then owned and possessed by the partnership and embraced the assets utilized in connection with the divisions known as Buda and the Control Company, and while the Clarks gave their personal notes to the bankrupt for the balance of their stock subscriptions, nothing was paid on these notes. They did, however, cause credits to be entered upon the books of the bankrupt, which at best constituted their appraisal of the worth of their services rendered to the bankrupt in the months that followed.

Within ten days the Clarks created Buda and the Control Company, and arranged to own all of the stock of these corporations, except nominal qualifying shares, which they took in the names of their wives. The Clarks then removed from the newly formed bankrupt corporation, assets of the book value of $82,430 and transferred them by book entry to Buda, and removed from the bankrupt, assets of the book value of $19,432.95 and transferred the same to the Control Company. These transactions were entered upon the books of the bankrupt and rested entirely upon the unsecured credit of the respondents, at a time when said transferees had no assets or capital whatever.

All of the assets that went into Buda and the Control Company came from the bankrupt, and then the capital structures of those companies were made up entirely of the promissory notes of the Clarks (upon which nothing has been paid) in the form of cash or assets transferred by the Clarks. Entries were made upon the books of Buda and the Control Company as credits against these note obligations. Neither Buda nor the Control Company was shouldered with any part of the obligations of the partnership theretofore assumed by the bankrupt.

The potentially profitable divisions of Buda and the Control Company were now severed and cloaked in corporate form, and all assets embraced in the previous operations of said divisions, together with such intangible assets as franchises and contracts were now transferred to the corporate instrumentalities.

In keeping with the central plan, no assets of any kind, other than assets of the partnership or its successor, the bankrupt, went into any of the three corporate respondents; and after all of such assets were removed, as already noted, the partnership and the bankrupt were left with net assets not exceeding a book value of $94.73. All liabilities of the partnership were loaded upon the bankrupt and never paid, but no change took place in the operation and management of the divisions and properties above referred to. Yet all of the corporate respondents, as well as the bankrupt, and their assets, properties and business, remained under the absolute dominion and control of E. H. and B. E. Clark who continued to use them and treat them as one enterprise, and in exactly the same manner as they did when these divisions functioned under the partnership. All of the corporate respondents, as well as the bankrupt, had identical officers, directors and stockholders. While the wives of the Clarks held offices, they in fact took no part, and though separate books and records were maintained, they were all kept at the offices of the bankrupt by one staff of bookkeepers and an accountant employed by the bankrupt under the sole direction of the Clarks. Assets were transferred from one corporation to another at the will of and to suit the purposes of the Clarks with total disregard of their fiduciary duties as custodians of the assets of each; there was indiscriminate commingling of the assets of the four corporations; the business af-

fairs, property and assets of these corporations were treated by the Clarks as one business, under one management; proceeds and funds raised by assignment of accounts of one company were utilized in the interests of the others; and the bankrupt was made to do the buying for all the corporate respondents, except certain machines which were purchased directly.

The bankrupt fabricated and produced parts and equipment for the respondents, never at a profit to the bankrupt, but at cost of labor and materials which costs were based on estimates of material and labor rather than the result of an accurate and properly developed cost system, also, such estimated costs did not generally include any factory overhead. At the direction of the Clarks, from time to time, the accounting force was required to prepare consolidated profit and net worth statements, embracing the bankrupt and the respondent corporations, to be used for credit purposes. In these consolidated statements all inter-corporate obligations were eliminated. Such statements were furnished Mercantile Discount Corporation, Midland Finance Corporation and Civic Finance Corporation. The Clarks have made a written admission that the bankrupt, as well as Todd, Buda and the Control Company, while separately incorporated, were parts of the Clark combine, and that it was the common practice of the Clarks to transfer funds from one to the other.

During the year 1946 and up to March 31, 1947, the Clarks diverted from the funds and assets of the bankrupt the sum of $45,939.16 to improve and enhance the Clybourn Street property, title to which was held by Todd. This was accomplished by ordering such repairs and improvements through the bankrupt. The total of these diverted funds was simply entered upon the books of the bankrupt as an unsecured receivable from Todd. No part of these diversions has been repaid, except that the Clarks caused credits to be entered against the same for such amounts as the Clarks deemed fair rental charges against the bankrupt for its use of the Clybourn Street property. The treatment of these diversions of the bankrupt's funds as unsecured advances to Todd left the Clarks free to incur other liabilities on the Clybourn Street property of a secured nature, which together with the pre-existing mortgage and liens total $106,000. Todd had but one remaining asset, namely, the Clybourn Street property. Through the instrumentality of the corporate charter of Todd, the Clarks dealt with this property as their own, and the transaction whereby the Clybourn Street property was transferred to Todd in return for some stock and notes of Todd, was not an "arms length" bargain. It was inherently unfair to the creditors, and the acceptance of the stock and unsecured notes of Todd as consideration for this transfer was grossly inequitable. The transaction was to the Clarks' personal advantage and to the detriment of the creditors of the partnership as well as to those who were to become creditors of the business as it continued according to the Clarks' plan.

The referee further found as a fact that as part of the plan E. H. Clark alone took from the bankrupt $106,500.97 over and above his self-designated salary of $4,166.66 a month in the period from January 1, 1946 to March 31, 1947. He also found that the plan to terminate the partnership medium of conducting business was not conceived in good faith in respect to existing and future creditors, and that the net worth of $94.73 was predicated upon an assumed correctness of book value of the assets as turned over to the bankrupt. Only by applying the most favorable presumptions is this net worth established.

As a result of this planned stripping of assets of the partnership, the new liabilities created in the business operations of the bankrupt were without means of payment. This result is reflected in the scheduled unpaid debts of $845,989.

Based upon these findings the referee concluded as a matter of law that Todd, in contemplation of equity, was an adjunct of the bankrupt—and from its creation has been a mere tool of the Clarks for the carrying out of their fraudulent scheme to place the Clybourn Street property and other assets beyond the reach of creditors of the partnership and those who they knew would become creditors in the continuance of the business under the corpo-

rate form of the bankrupt; that the fiction of the corporate entity of Todd must, in the interest of justice, be disregarded and its assets treated as those of the bankrupt; that Todd does not have any substantial adverse interest as against the trustee of the bankrupt as to the assets of Todd; and that respondents' interests are merely colorable.

The District Court approved the referee's findings and conclusions and entered an order that the title to these proceedings be amended to include Todd Building Corporation, and that its creditors be ordered to file their claims with the referee; that Todd is not a separate entity, but is in fact a part and parcel of the bankrupt; that the two Clarks as individuals and as officers of Todd file schedules of assets and liabilities of Todd; and that all the property in possession of Todd be turned over to the trustee in bankruptcy of Clark Supply Company.

At the outset we are met with the contention that the District Court lacked jurisdiction to enter the order appealed from. The argument is that the proceeding was initiated by the filing of a petition asking only that the Clarks, Todd and a number of other corporations closely related to the bankrupt be enjoined from transferring any property or other assets which had belonged to the bankrupt or in which it had or had had any interest; that the petition contained no prayer for general relief, and was never amended to conform to the evidence on the hearings before the referee.

Our study of the record convinces us that the scope of the hearing was so broadened, with the understanding and consent of the parties, that, under the provisions of Rules 15(b) and 54(c) of the Federal Rules of Civil Procedure, 28 U.S. C.A.[1], the trustee was entitled to a judgment equally broad in scope. The record sustains appellee's contention that the question whether the assets of Todd were part of the bankrupt estate was at issue, and that appellant so understood. In its main brief appellant stated, "The proceeding before the Referee on the Receiver's petition to enjoin the transfer by Todd Building Corporation of any assets in its possession belonging to the bankrupt, against the objections of the Todd * * * took the final form of an attack by the Trustee on the very corporate existence of Todd * * *." In this state of the record we think the court had jurisdiction to enter the order appealed from. See Matarese v. Moore—McCormack Lines, 2 Cir., 158 F.2d 631, 170 A.L.R. 440; McAllister v. Sloan, 8 Cir., 81 F.2d 707; and Maruska v. Maruska, 7 Cir., 155 F.2d 302, 303.

Appellant next contends that inasmuch as appellee's petition only asked to enjoin the transfer by Todd of any assets in its possession belonging to the bankrupt, the court erred in proceeding thereunder to a summary hearing and a determination that Todd fraudulently received assets from the bankrupt and that all of Todd's assets were the assets of the bankrupt.

A mass of evidence was introduced which was neither admitted nor denied by

---

[1] 15(b). "Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; *but failure so to amend does not affect the result of the trial of these issues.* If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence." (Our emphasis.)

54(c). "Demand for judgment. * * * Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

E. H. Clark, for he did not testify. On this, Todd presents two issues. It first urges that inasmuch as the petition sought only to enjoin Todd from transferring any assets in its possession belonging to the bankrupt, the court cannot proceed to a summary hearing and determination that Todd fraudulently received assets from that bankrupt. To support this contention it relies on the well known legal proposition that where it appears that the adverse claimant's right to property claimed is more than colorable, a bankruptcy court has no jurisdiction to summarily proceed to determine such right. See Harrison v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897, and other like cases. However it concedes that a bankruptcy court may proceed to summary hearing and set aside a corporate entity as fraudulent as against creditors of a bankrupt. Sampsell v. Imperial Paper & Color Corporation, 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293. Moreover, appellee denies that Todd's title was ever more than colorable, and if this be true, this line of decisions will avail Todd nothing. We have substantially set forth the referee's findings of facts. They are supported by an abundance of substantial evidence. They bear the acceptance and approval of the District Court, and by them we are bound.

The remaining question raised by Todd is that there is an absence of evidence to support the findings that Todd was organized with intent to defraud the present and future creditors of the partnership. Under this issue it urges that (1) a corporate entity can be disregarded only upon a compelling showing that its formation and existence are for the purpose of promoting fraud and injustice, and where actual intent to defraud creditors has been proved by clear, satisfactory and convincing evidence; and (2) that the mere fact that such concerned corporations have common officers and offices and to a certain extent do business with each other does not of itself make any of them liable for the acts of the others.

We agree with appellant's first contention as to this issue as thus stated, excepting the second subdivision which contains the clause "and to a certain extent do business with each other does not of itself make them liable for the acts of the others." However, the second portion is entirely too indefinite as to the character and extent of business thus transacted, and as to the result sought to be accomplished, or what follows as a natural consequence. We know of no reason why such persons should not be held strictly accountable for the natural consequences of their intentional acts. The doctrine of corporate entity will not be regarded when to do so would work fraud or injustice as disclosed by these findings, and we think the District Court had jurisdiction of this action in summary proceedings. Sampsell v. Imperial Paper & Color Corporation, supra; Taylor v. Standard Gas & Electric Company, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669; and Stone v. Eacho, 4 Cir., 127 F.2d 284 and 4 Cir., 128 F.2d 16.

Order affirmed.