**In the Matter of LEHIGH VALLEY RAILROAD COMPANY.**

**Claim of PENN CENTRAL TRUSTEES FOR INTERLINE BALANCES.**
**No. 70–432.**

United States District Court,
E. D. Pennsylvania.
Feb. 20, 1974.

Richard R. Bongartz, Westport Harbor, Mass., and Carl Helmetag, Jr., Philadelphia, Pa., for the trustees, Penn Central Transportation Co.

Duane, Morris & Heckscher by William R. Traub, Philadelphia, Pa., for the trustees, Lehigh Valley Railroad Co.

Willkie, Farr & Gallagher by Walter H. Brown Jr., New York City, for Institutional Investors, Penn Central Group.

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, trustee, New York, New Haven & Hartford Railroad Co.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, Philadelphia, Pa., for Girard Trust Bank, indenture trustee under Penn Central indentures.

Ballard, Spahr, Andrews & Ingersoll by Oliver Caldwell Biddle, Philadelphia, Pa., for Girard Trust Bank, indenture trustee under Lehigh Valley indentures.

Sherman & Sterling by John E. Hoffman, Jr., New York City, for indenture trustees of the Lehigh Valley Railroad Co.

Strong, Barnett, Hayes & Quinn by William P. Quinn, Philadelphia, Pa., for Delaware & Hudson Railway Co.

Morgan, Lewis & Bockius by John N. Schaeffer, Jr., Philadelphia, Pa., for Fidelity Bank, indenture trustee.

Fox, Rothschild, O'Brien & Frankel by Nochem S. Winnet, Philadelphia, Pa., for First National City Bank of New York.

Gordon P. MacDougall, Washington D. C., for the Commonwealth of Pennsylvania.

T. P. Shearer, Pittsburgh, Pa., for United Transportation Union.

Jerome E. Sharfman, Washington, D. C., for United States Dept. of Trans.

## OPINION AND ORDER NO. 226

FULLAM, District Judge.

In 1962, the Pennsylvania Railroad (predecessor to Penn Central Transportation Company) acquired ownership of 97.3% of the common stock of the Lehigh Valley Railroad Company. In 1966, when the merger between the Pennsylvania Railroad and the New York Cen-

tral was under consideration by the Interstate Commerce Commission, the possible adverse effects of the proposed merger upon the Lehigh Valley (and the public interest in the competitive rail service provided by Lehigh Valley) were a cause of concern. In its April 6, 1966 report, Pennsylvania Railroad Company—Merger—New York Central Railroad Company, Finance Docket 21989, ICC Finance Reports, Vol. 327, p. 475, et seq., approving the merger, the Commission imposed certain conditions pertaining to the relationship between Penn Central and Lehigh Valley. Condition No. 13 (327 ICC Reports at p. 555) required both companies to negotiate in good faith with the Norfolk & Western Railway Company for a proposed merger of the Lehigh Valley into the N&W. Condition No. 14 (*ibid*) contained the following provisions:

"14. Until otherwise relieved by this Commission, [Penn Central] shall retain its stock and other holdings to the degree now maintained in Lehigh Valley Railroad Company and render such support, financial and otherwise, as the Commission, from time to time, may determine necessary to keep such railroad operational. . . ."

Condition 14 further provided, in essence, that if after 10 years, Lehigh Valley had not been merged into the N&W or the Chesapeake & Ohio Railway Company, the Commission would consider the desirability of ordering the inclusion of the Lehigh Valley into the Penn Central "upon such terms as may be found just and reasonable and such action shall be binding upon [Penn Central]."

The ICC order embracing the conditions set forth above followed a Hearing Examiner's report which, after discussing the possible desirability of merging Lehigh Valley into the N&W and the C&O/B&O, stated as follows (*ibid* p. 942):

"In the event, however, that despite its best efforts, neither alternative is accomplished within ten years from the date of consummation or such additional time as the Commission may determine necessary, it is our conclusion that the merged company should be required to merge the franchises and properties of LV into its system operations, and that during the interim the merged company shall be required to maintain its present stock interests to the degree of its present holdings in LV and provide such support, financial or otherwise, as the Commission may from time to time deem advisable.

"With respect to the latter conditions, as previously indicated, LV depends largely upon the support of PRR for its traffic . . . We do not mean to infer that the former shall assume the existing debt structure of the latter nor support its uneconomical operations which may exist or come into being during the interim. We believe that such support as may be necessary to keep LV operational should be required, especially if a causal relationship between its condition and the operations resulting from this merger are established. . . ."

By consummating the merger on February 1, 1968, Penn Central accepted the merger conditions imposed by the Commission.

In the normal course of operations of the two railroads, more money becomes due and owing from the Lehigh Valley to the Penn Central than vice-versa. While the amounts of these "interline balances"[1] fluctuate from month to month, they average approximately $400,000 per month (at present, about $380,000). Both before and after the merger, Lehigh Valley was often unable to meet its obligations to Penn Central. Penn Central's accounting department

---

1. For a detailed description of interline accounts, see the Opinion of this Court in In re Penn Central Transportation Company, 340 F.Supp. 857 (1972).

also performed the accounting services for Lehigh Valley, and the two companies had a common treasurer. Penn Central made no attempt to collect the amounts due. Indeed, on one occasion, when Lehigh Valley was unable to redeem certain of its bonds falling due, Penn Central purchased the outstanding bonds at face value on the maturity date.

Penn Central entered reorganization under the Bankruptcy Act on June 21, 1970. Lehigh Valley followed on July 24, 1970. As of July 31, 1970, Lehigh Valley owed Penn Central $16,387,647.10 for unpaid interline balances, the earliest of which had remained unpaid since April of 1967.

During reorganization, the Penn Central Trustees have consistently taken the position that, whatever might be the status of the pre-reorganization balances, post-reorganization interline balances should be paid on a current basis, as administration expenses. Until recently, the Lehigh Valley Trustees have not contended otherwise, but for the most part have been unable to pay substantial amounts because of the chronic lack of cash. Various payments on account have been made, and various attempts to resolve the matter have been pursued.

In 1972, the two sets of trustees submitted to this Court for approval a proposed settlement agreement, under the terms of which Lehigh Valley would acknowledge the interline obligation to Penn Central as an administration claim, would pay amounts accruing thereafter on a current basis, and would make certain installment payments on the arrearages. At the hearing, the creditors of both railroads objected. Penn Central's creditors asserted that, to the extent that Lehigh Valley might be unable to meet its interline payments to Penn Central, the deficiency should be prorated among all of Lehigh Valley's interline creditors, rather than leave Penn Central as the only interline railroad not receiving full payment from Lehigh Valley. The objections of the Lehigh Valley creditors were based on one or more of the following contentions: that, in view of merger condition No. 14, Lehigh Valley was not obligated to pay Penn Central at all; Lehigh Valley Trustees might have a claim against Penn Central for diversion of traffic or other actions adversely affecting the financial condition of Lehigh Valley; and, in any event, if there was an obligation on the part of Lehigh Valley to pay the interline balances, that obligation should be subordinated to the rights of the secured pre-bankruptcy creditors of the Lehigh Valley.

By the time of the hearing on the proposed settlement agreement, the occurrence of tropical storm Agnes had caused all concerned to recognize that the Lehigh Valley Trustees would not be able to carry out that part of the proposed settlement agreement relating to payments on a current basis. Disposition of the proposed settlement agreement was deferred to await developments.

In 1973, the Lehigh Valley Trustees petitioned for authorization to cease all rail operations unless adequate federal assistance were in the offing by September. Disposition of that petition was likewise deferred, in view of the imminent prospect of legislation.

On January 2, 1974, the Regional Rail Reorganization Act of 1973, P.L. 93–236, became law.

On January 23, 1974, the Penn Central Trustees filed a petition in the Lehigh Valley proceeding (Document No. 1009) seeking to compel the Lehigh Valley Trustees to pay the interline balances on a current basis. On January 25, 1974, the Lehigh Valley Trustees filed petitions in both proceedings (Document No. 6933 in the Penn Central case, Document No. 1010 in the Lehigh Valley case) seeking to withdraw from the earlier proposed settlement agreement, seeking an adjudication of the status of the interline claim, and seeking continued authorization to defer all interline payments to Penn Central. A hearing on all three petitions was held on February 15, 1974.

As of December 31, 1973, the total amount of interline settlements due Penn Central which have accrued since reorganization, and which remain unpaid, was $14,532,253.02. Interline balances due Penn Central will continue to accrue at the rate of approximately $380,000 per month.

There is no evidence that actions taken by Penn Central before bankruptcy, or by the Penn Central Trustees since bankruptcy, by virtue of Penn Central's pre-reorganization control over Lehigh Valley, have been detrimental to the Lehigh Valley. There is no evidence of diversion of traffic or other improper competitive practices by Penn Central to the detriment of Lehigh Valley.[2]

At no time since reorganization have the Penn Central Trustees exercised any degree of control over the affairs of the Lehigh Valley. The Lehigh Valley is controlled by its own independent Trustees. The management of the two railroads has been completely independent, although Penn Central has provided certain computer and other services on a contract basis.

The Interstate Commerce Commission has never entered any orders requiring Penn Central to provide support to the Lehigh Valley, and no one has ever sought such an order.

The record does not reveal what efforts, if any, were made before bankruptcy to cause the merger of the Lehigh Valley into some other rail system. However, the Lehigh Valley Trustees, since reorganization, have constantly attempted to interest other lines, including the N&W and the C&O/B&O, in a possible acquisition of the Lehigh Valley, but these efforts have not been successful. In addition, the Lehigh Valley Trustees have pursued, thus far without success, a proposed consolidation of the Lehigh Valley with the Reading and Central Railroad of New Jersey.

The Lehigh Valley creditors, and now the Lehigh Valley Trustees as well, argue that the ICC knew about Penn Central's ongoing support of Lehigh Valley, and tacitly approved the practice; that this is equivalent to an actual order by the Commission in implementation of condition 14; and that Penn Central must continue this support unless and until Penn Central prevails upon the Commission to order otherwise. There are at least three difficulties with this line of argument. In the first place, it is far from clear that the Commission had specific knowledge of the practice. While both railroads showed the aggregate indebtedness in their accounts filed with the Commission, the precise nature of the obligation is not revealed in the accounts. Moreover, the only indication that the Commission ever considered the matter is that at one time, the Commission instructed the parties to transfer the obligation to a deferred liability account, because it was not expected to be paid within 12 months.

In the second place, even specific knowledge by the Commission that Penn Central was voluntarily extending credit to the Lehigh Valley, and specific approval of the practice, is simply not equivalent to an order by the Commission mandating continuation of the practice.

And finally, it bears emphasis that the unpaid interline balances have always been regarded as debts of the Lehigh Valley; no one has remotely suggested that they were intended as gifts, or as equity capital contributions. Granted, under the principles laid down in such cases as Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1934), as between Penn Central and the other creditors of Lehigh Valley, the latter can insist that the pre-bankruptcy advances be treated as if they were con-

---

2. At the 1972 hearing certain Lehigh Valley creditors argued that they had had no opportunity to explore these issues adequately. Whatever validity this argument may have had then, it seems clear that there has now been ample opportunity for such exploration. This contention was not pursued at the February 15, 1974, hearing.

tributions to equity. But this does not mean that, after both railroads are in bankruptcy, the Trustees of Penn Central can be required to make further contributions to the (negative) equity of Lehigh Valley. In short, whatever may have been the legal consequences of the relationship between Penn Central and Lehigh Valley before bankruptcy, the *Trustees* of the two roads occupy an entirely different relationship.

I have concluded, therefore, that the proper treatment of post-petition interline balances cannot be based upon the notion that the ICC has directed incurral of these obligations pursuant to merger condition 14.

In a related line of argument, it is suggested, by the Commonwealth of Pennsylvania, among others, that the true intent and spirit of merger condition 14 is to require Penn Central to absorb the Lehigh Valley. If the two reorganization proceedings had been fully consolidated instead of being treated as related but separate proceedings, it is argued, the post-bankruptcy interline balances would be mere bookkeeping entries, adding to Penn Central's operating losses.

While this argument can properly be advanced by the Commonwealth, I do not believe it can be, or really is, urged by the Lehigh Valley interests. From the early stages of both proceedings, when attention focused upon the interline balance issues, the question of whether the Lehigh Valley should be "folded into" the Penn Central proceedings has been a recurring subject of consideration by both sets of Trustees and by the secured creditors of both railroads.

Since no one has ever sought to obtain consolidation, I have not attempted to analyze all of the possible ramifications of such a move. Presumably, much would depend upon the extent to which the operation of the two railroads would remain separate, a matter as to which it cannot be assumed that prompt and foreseeable regulatory answers would have been forthcoming. The effects of such consolidation upon total revenues, and upon the realizable values of the respective properties, would likewise be somewhat conjectural. And it may well be that, as between the creditors of Penn Central and the creditors of Lehigh Valley, consolidation of the two proceedings would not affect the "interline" issues.

Be all that as it may, the fact remains that the Trustees and creditors of the Lehigh Valley have apparently concluded that the best interests of Lehigh Valley would not be served by such consolidation.

Moreover, the most that can be said of merger condition 14 in this context is that the Commission, on the basis of its 1966 perceptions about the Penn Central merger, reserved the right after 10 years to reevaluate the situation and, if appropriate, to require inclusion of the Lehigh Valley into the Penn Central system. To suppose that the Commission would now conclude that the benefits of the Penn Central merger were so pronounced that absorption of the Lehigh Valley and its interline deficits should be added to the price—or that the Constitution would permit that result—is to lose touch with reality.

■ Whatever the nature of the obligation to absorb the Lehigh Valley which merger condition 14 may have imposed upon the Penn Central—absolute or contingent, enforceable by the Lehigh Valley or only by the Commission, cancelling or recognizing the interline debt —it is a pre-bankruptcy obligation. It is not binding upon the Penn Central Trustees unless they adopt it, and they certainly have not done so. If there is an obligation enforceable by the Lehigh Valley, it can be asserted in the Penn Central *proof of claims program*, or perhaps by way of setoff in the Lehigh Valley proof of claims program, but it cannot be accorded the post-bankruptcy priority status which the Lehigh Valley parties now seek.

■ For all of the foregoing reasons, I have concluded that the post-reorgani-

zation interline claims of Penn Central against Lehigh Valley are administration claims, and should be paid on a current basis. The Penn Central Trustees have disavowed any intention of insisting upon immediate payment of the $14 million accrued to date. The present question thus concerns the amounts which will hereafter accrue.

The Lehigh Valley Trustees have convincingly demonstrated that, if required to pay Penn Central's interlines on a current basis, they will run out of cash in six months' time. However, it is also a matter of common knowledge to all concerned that the Penn Central, too, is suffering from a shortage of cash. On February 19, 1974, in the Penn Central proceedings, the Trustees petitioned for authority, on an emergency basis, to obtain approximately $10.8 million pursuant to the Regional Rail Reorganization Act of 1973, in order to avoid defaulting on equipment obligations; and the Penn Central Trustees have predicted a further cash shortfall of approximately $20 million in August of 1974.

Section 213 of the Regional Rail Reorganization Act of 1973 authorizes the Secretary of Transportation to make cash grants to railroads in reorganization, to the extent necessary to enable them to continue to provide essential rail service, pending completion of the reorganization and restructuring procedures contemplated by that statute. I recognize that other litigation is now pending, challenging the constitutionality of that statute, and that, in any event, there must be further proceedings to determine whether either or both of these railroads will be reorganized pursuant to the statute. No matter what may be the final outcome of these issues, it is self-evident that, if these rail-roads are to continue in operation, there must be an infusion of cash sufficient to enable them to do so. And I believe that the true picture for both railroads should be available for evaluation in that connection. The true cash picture of the Penn Central should not be artificially worsened, nor should the true cash picture of the Lehigh Valley be artificially improved, by further deferrals of the Lehigh Valley interline obligations.

In view of the conclusions expressed above, the question of the status of the proposed settlement agreement is now moot.

ORDER NO. 226

And now, this 20th day of February, 1974, it is Ordered:

1. That the Trustees of the Lehigh Valley Railroad Company shall promptly pay to the Trustees of the Penn Central Transportation Company the amount of the interline balance due and owing to the latter for the month of January 1974, and shall hereafter pay such interline accounts as they accrue.

2. That the unpaid balances of all interline accounts for the period from and after July 31, 1970, are hereby declared to be, and shall be treated as, administration claims against the Lehigh Valley estate.

3. The Trustees of the Lehigh Valley Railroad Company are directed to apply promptly for financial assistance pursuant to § 213 of the Regional Rail Reorganization Act of 1973, and to submit to this Court for approval whatever arrangements may be proposed for such assistance.