**In the Matter of LEHIGH VALLEY RAILROAD COMPANY, Debtor.**

**Appeal of COMMONWEALTH OF PENNSYLVANIA, in No. 74–1356.**

**Appeal of TRUSTEES OF LEHIGH VALLEY RAILROAD COMPANY, Debtor, in No. 74–1363.**

**Appeal of DELAWARE & HUDSON RAILWAY COMPANY, in No. 74–1379.**

**Appeal of PENNSYLVANIA STATE LEGISLATIVE BOARD and United Transportation Union, in No. 74–1388.**

**Appeal of CHEMICAL BANK et al., in No. 74–1424.**

**Nos. 74–1356, 74–1363, 74–1379, 74–1388 and 74–1424.**

United States Court of Appeals, Third Circuit.

Argued Nov. 19, 1974.

Decided Jan. 23, 1975.

As Amended Feb. 7, 1975.

William R. Traub, Robert L. Pratter, Duane, Morris & Heckscher, Philadelphia, Pa., for Trustees of Lehigh Valley Railroad Company, Debtor.

John E. Hoffman, Jr., Matthew C. Gruskin, Shearman & Sterling, New York City, for Chemical Bank, The Fidelity Bank, First National City Bank and Girard Trust Bank, Indenture Trustees.

William P. Quinn, Strong, Barnett, Hayes & Quinn, Philadelphia, Pa., for Delaware & Hudson Railway Company.

Israel Packel, Atty. Gen., Harrisburg, Pa., Michael von Moschzisker, Deputy Atty. Gen., Philadelphia, Pa., Gordon P. MacDougall, Sp. Asst. Atty. Gen., Washington, D. C., for Commonwealth of Pennsylvania.

Thomas P. Shearer, Pittsburgh, Pa., for United Transportation Union.

Richard R. Bongartz, Westport Harbor, Mass., Terrence M. Quirin, Philadelphia, Pa., for Trustees of Penn Central Transportation Company, Debtor, Trustees.

Before ADAMS, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This is an appeal pursuant to 11 U.S.C. § 47 from Order No. 226 of the district court in proceedings under § 77 of the Bankruptcy Act for reorganization of the Lehigh Valley Railroad Company. The order, made as a result of a petition filed by the Trustees of Penn Central Transportation Company, directs the Lehigh Valley trustees to pay post-reorganization net interline balances due to Penn Central on a current basis. The district court judge who supervises both the Lehigh Valley and the Penn Central reorganizations, held that the post-reorganization net interline balances from Lehigh Valley to Penn Central were administration expenses of the Lehigh Valley reorganization, and were to be paid on a current basis beginning with those incurred in January, 1974. Unpaid interline balances from July 31, 1970, the closest settlement of accounts date following the Lehigh Valley petition for reorganization, were held to be administration claims against the Lehigh Valley estate. In re Lehigh Valley Railroad Co., 371 F.Supp. 210 (E.D.Pa.1974) (Claim of Penn Central Trustees for Interline Balances).

Order No. 226 was entered over the objection of The Commonwealth of Pennsylvania (appellant in No. 74–1356); United Transportation Union (appellant in No. 74–1388) which is the collective bargaining representative for some Lehigh Valley employees; the Delaware & Hudson Railway Co. (appellant in No. 74–1379) which interchanges freight with Lehigh Valley; the Lehigh Valley mortgage indenture trustees (appellants in No. 74–1424); and the Lehigh Valley trustees (appellants in No. 74–1363).

All the appellants argue that requiring Lehigh Valley to make current payment of interline balances will endanger the continued ability of Lehigh Valley to maintain rail operations. They contend that a condition of the 1968 merger between the Pennsylvania Railroad and the New York Central, imposed in the Interstate Commerce Commission's approval of that merger was that Penn Central must keep the Lehigh Valley operational. The appellants urge that the Penn Central trustees hold the Penn Central franchises subject to the I.C.C. condition, and that the condition precludes their demand for current payment of the net interline balances. The Lehigh Valley trustees also urge that the I.C.C. condition precludes treatment of post-reorganization net interline balances as expenses of administration. The Lehigh Valley mortgage indenture trustees contend that the post-reorganization net interline balances due Penn Central must be subordinated to the pre-reorganization claims of Lehigh Valley's secured creditors. Order No. 226 in effect rejected each of these contentions. Order No. 233 stayed the current payment provisions of Order No. 226 and directed that the net current interline balances be placed in escrow pending appeal.

The Lehigh Valley Railroad runs from Buffalo, New York to the Port of New York. It connects with the Delaware & Hudson with which it interchanges New England and Canadian traffic, at Owego, New York and Wilkes-Barre, Pennsylvania. It connects with the Penn Central, with which it interchanges western and southern traffic, at Buffalo, New York, and Wilkes-Barre, Pennsylvania. In 1962, while the Pennsylvania Railroad and the New York Central were still competitors the former acquired ownership of 97.3% of the common stock of Lehigh Valley. It continued to operate Lehigh Valley as a separate entity with independent management, except that Pennsylvania's accounting department undertook accounting services for the Lehigh Valley, and both companies had a common treasurer. The Buffalo interchange with Lehigh Valley was of great significance since it gave Pennsylvania a route to the Port of New York and to New England competitive with the New York Central route through Albany, New York. In 1962, negotiations looking toward merger were also going forward between the Pennsylvania and New York Central. An important feature of what became the proposed merger were the economies to be achieved by routing incoming western traffic over the New York Central lines from Buffalo through Selkirk, New York, to the New York metropolitan area, and to New England over other lines in the New York Central System. However, these economies would eliminate any incentive for a merged Penn Central to interchange traffic with Lehigh Valley at Buffalo, and cast doubt upon the latter's ability to operate. In addition such a development could, in turn, damage the Delaware & Hudson which interchanged considerable freight traffic with Lehigh Valley at Wilkes-Barre, Pennsylvania.

The merger between the Pennsylvania and the New York Central required the approval of the Interstate Commerce Commission. Under § 5(2)(b) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(b).

"[i]f the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed [merger] transaction . . . will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . .."

The Commission is specifically required to give weight to

"(1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction . . .." 49 U.S.C. § 5(2)(c).

The Commission's Report of April 6, 1966, which approved the Penn-Central merger, described the legal effect of conditions imposed under § 5 of the Act:

"The Commission's power under section 5 is limited to the application before it and the consequences thereof. Orders issued pursuant thereto are permissive, and obligations imposed upon applicants as conditions of approval are inchoate, *attaching with binding force only if the proposed transaction is consummated.* If the transaction is not consummated, though approved, the conditional obligations under our order evaporate. Pennsylvania R. R. Co.–Merger–New York Central R. R. Co., 327 I.C.C. 475, 538 (1966) (emphasis supplied).

The Commission's Report was referring to obligations it imposed pursuant to 49 U.S.C. § 5(2)(b) as conditions to the merger which, when consummated on February 1, 1968, produced the Penn Central.

The effect of the then proposed merger on the Lehigh Valley was a cause of concern to the Commission. The hearing

examiner presiding over the I.C.C.'s proceedings recognized that the consequences of the merger would be so severe on the Lehigh Valley that it could not survive unless it became a part of a major rail system.[1] Appendix "U", re-

1. The hearing examiner's report stated in part:

"L.V.—Operating under control of P.R.R., L.V. today competes with N.Y.C.'s lines extending from Buffalo to the New York City area. As indicated, L.V. is highly dependent upon off-line shippers and connecting carriers for a substantial portion of its traffic, and the record indicates that P.R.R. interchanges over 70,000 carloads with L.V. annually. Based on the fact that a community of financial interests exists between P.R.R. and L.V., and on the heretofore accepted principle that a carrier will prefer a subsidiary to a competitor or independent road in routing traffic, we must assume that the relationship between P.R.R. and L.V. is extremely close and that L.V. is greatly dependent upon P.R.R. as a source of traffic. Furthermore, in light of the poor financial condition of L.V., it is apparent that the latter needs the support of P.R.R. to remain viable.

The merger of N.Y.C. into P.R.R., resulting in a significant improvement in service and a material reduction of costs on operations over N.Y.C.'s lines extending from Buffalo to New York City through Selkirk, will undoubtedly shift P.R.R.'s incentive from a routing via L.V. especially traffic moving to and from the New York Metropolitan area, to an all P.R.R. route via Selkirk. Since it is our view that a parent corporation and its subsidiary will compete only as long as it is to the economic advantage of the parent, we find in the proposed merger a strong possibility that L.V. will be adversely affected through the routing by the merged company or shippers of their traffic to the more efficient and less costly lines via Selkirk. This, we believe, in time, would further weaken L.V.'s present condition and possibly seriously affect its ability to provide service to the public.

The fact that L.V. presented no evidence of diversionary impact at hearing is not significant, for its domination by P.R.R. obviously precluded independent action. We believe that, in this instance, P.R.R. had the positive obligation of establishing that no adverse effect would result to L.V. and, despite the lack of participation in this proceeding by the affected road, in this instance, applicants failed to meet their burden. On this basis, therefore, and for additional reasons subsequently considered, *specific protective conditions will be provided.*

. . . . .

At hearing, P.R.R. indicated a willingness to sell its majority stock interests in L.V. to the C&O/B&O System. Of record, however, it was pointed out that C&O had failed to elicit any interest in applicants' proposal and, in fact, at oral argument in the *C&O/B&O* proceeding, the attorney representing applicants therein specifically declined such offer. Despite this, we believe the door should be left open as wide as possible for C&O to reconsider its earlier decision and also for the Commission to consider the possible inclusion of either E–L or L.V. in one or the other major systems which presently do not have access to New York City through the Buffalo Gateway.

The application to merge the franchises and properties of C&O and B&O, if filed, may provide such a vehicle and the inability to formulate fair and equitable conditions or inclusion of E–L into the N&W System within the 5-year period as provided, may justify the latter in seeking entrance to the New York City Metropolitan area through acquisition of L.V.

While the Commission no longer holds authority to inaugurate basic rail consolidation plans, it has the obligation under sections 5(2)(c) and 5(2)(d) to insure that voluntary plans are complete in that they take into account such railroads as should be included therein to maintain competitive balance or as may otherwise be in the public interest. The opportunities for the Commission to achieve such objectives should be maximized.

In this respect, we are not concluding on this record that it would be in the public interest for L.V. to be included in either the C&O/B&O or N&W Systems, for that depends first, upon the issue being jurisdictionally raised before the Commission; and, secondly, upon the development of facts which would justify such inclusion, not the least of which is that incorporation thereof would be economically justified and not impose an undue burden upon the carrier. It is our opinion, however, that insofar as the merged company has control over the situation, that conditions should be imposed requiring it to use its best efforts to obtain a place for L.V. in either the C&O/B&O System, or if E–L is precluded from entry into the N&W System, into the latter. In the event, however, that despite its best efforts neither alternative is accomplished within 10 years from the date of consummation or such additional time as the Commission may determine necessary, it is our conclusion that the merged company should be required to merge the franchises and properties of L.V. into its system opera-

ferred to in the hearing examiner's report, lists twenty suggested conditions to the proposed merger,[2] including Conditions No. 14 and No. 16 dealing specifically with the Lehigh Valley.

When the Commission reviewed the hearing examiner's report it approved the proposed merger, "[s]ubject to the various conditions set out in this report, including the appendixes as well as to those referred to in the initial report not deleted or modified herein . . . ." [3] Appendix "A" to the Commission's Report lists "[c]ertain conditions to approval imposed in lieu of the conditions set forth in appendix U to the hearing examiner's report." [4]

tions, and that during the interim the merged company shall be required to maintain its present stock interests to the degree of its present holdings in L.V. and provide such support, financial or otherwise, as the Commission may from time to time deem advisable.

With respect to the latter conditions, as previously indicated L.V. depends largely upon the support of P.R.R. for its traffic. After merger, however, it would be placed in an untenable position by reason of incorporation in the merged company of the N.Y.C. Buffalo-New York City line which would attain maximum efficiency through the construction of yard facilities at Selkirk. The consummation, therefore, would provide P.R.R. with some degree of incentive to route traffic away from L.V. It is quite apparent that L.V. cannot maintain its present position indefinitely and that either it must find an affiliation with either N&W or C&O/B&O or be merged into its present parent. While the former alternative from a competitive standpoint is obviously the more preferred, the latter provides a valid alternative in light of existing conditions and will insure a continued service to shippers and other members of the public which are dependent upon L.V. By requiring the merged company to provide support for L.V. to keep it operational, we do not mean to infer that the former shall assume the existing debt structure of the latter nor support its uneconomical operations which may exist or come into being during the interim. We believe that such support as may be necessary to keep L.V. operational should be required, especially if a causal relationship between its condition and the operations resulting from this merger are established. *The specific terms of such conditions are set forth in appendix U.*" Pennsylvania R. R. Co.–Merger–New York Central R. R. Co., 327 I.C.C. 566, 919–20, 941–42 (1965) (Report Order of Hearing Examiner) (emphasis supplied).

**2.** 327 I.C.C. at 1068–72.

**3.** Several of the conditions set forth in Appendix "U" to the hearing examiner's report were in conflict with the Commission's. In order to avoid confusion, the Commission attached Appendix "A" to their report listing conditions corresponding generally to those contained in Appendix "U" of the examiner's report but modified to accord with their own decision. Pennsylvania R. R. Co.–Merger–New York Central R. R. Co., 327 I.C.C. 475, 547 (1966) (Commission Report). The modifications as they are pertinent here are not significant.

**4.** 327 I.C.C. at 551. Appendix "A" is set out in *id.* at 551–55. Among those conditions are the following relating to the Lehigh Valley:

"12. Pennsylvania New York Central Transportation Company and its subsidiary, the Lehigh Valley Railroad Company, shall be required (1) to propose negotiations and if such offer is accepted to negotiate in good faith with Chesapeake and Ohio Railway Company, its affiliates and/or subsidiaries with respect to inclusion of the Lehigh Valley Railroad Company in the Chesapeake and Ohio Railway Company; (2) to file or join in the necessary applications or pleadings including petitions for inclusion in any appropriate proceeding to bring about the inclusion of Lehigh Valley Railroad Company in The Chesapeake and Ohio Railway Company and (3) to cooperate to the fullest extent in the development of an adequate record to provide a basis for the required determination by this Commission as to whether such a transaction would be in the public interest. In the event such matter is presented and if after hearing, it is determined by the Commission that such transaction is consistent with the public interest and the parties thereto are unable to agree the Commission shall impose such terms and conditions as it deems just and reasonable, and such action shall be binding on the Pennsylvania New York Central Transportation Company.

13. After October 16, 1969, or upon issuance of an order by this Commission denying the petition of Erie-Lackawanna Railroad Company for inclusion in the Norfolk and Western Railway Company, Pennsylvania New York Central Transportation Company and its subsidiary, the Lehigh Valley Railroad Company, shall be required (1) to negotiate in good faith with the Norfolk and Western Railway Company, its affiliates and/or subsidiaries with respect to inclusion of the Lehigh Valley Railroad Com-

The Penn-Central merger was consummated on February 1, 1968. Following the prior practice of the Pennsylvania Railroad, Penn Central continued to perform all treasury and accounting functions for the Lehigh Valley. Penn Central also provided financial support by not attempting to collect upon the interline accounts and other accounts and balances owed by the Lehigh Valley.[5] As of July 24, 1970, when the Lehigh Valley petitioned for reorganization under § 77 it owed Penn Central $16,387,647.10 for unpaid interline balances.

In Order No. 1 in the Lehigh Valley reorganization, the district court directed the trustees of the Lehigh Valley to pay interline balances except those due the Penn Central. At the same time, the trustees of the Lehigh Valley, in their discretion, were authorized to make such payments to Penn Central. Following negotiations between the trustees of

both railroads, and the approval of the district court, the Lehigh Valley paid a total of $2,407,397 on account of interline balances that had accrued in the post-bankruptcy period commencing on July 31, 1970. No further payments were made after March, 1972. As of December 31, 1973 the sum of unpaid post-reorganization interline balances owed by the Lehigh Valley to Penn Central totaled $14,532,253, and they continued to accrue at the rate of approximately $380,000 a month.

On January 2, 1974 the Regional Rail Reorganization Act of 1973 became law. 45 U.S.C. § 701 et seq. On January 21, 1974, the trustees of Penn Central filed a petition in the district court below requesting an order that Lehigh Valley pay its current interline balances owed to the Penn Central. The Penn Central trustees also asked the court to order the Lehigh Valley to apply for a § 213 grant under the Rail Reorganization Act, 45

---

pany in the Norfolk and Western Railway Company; (2) to file such applications or other pleadings as may be necessary to bring about the inclusion of Lehigh Valley Railroad Company in the Norfolk and Western Railway Company; and (3) to cooperate to the fullest extent in the development of a record to provide a basis for the required determination by this Commission as to whether such a transaction will be in the public interest. In the event such matter is presented within ten years from the date of consummation here, and if after hearing, the Commission determines that such transaction is consistent with the public interest and that parties thereto are unable to agree, the Commission will impose such terms and conditions as it deems just and reasonable and such action shall be binding upon the Pennsylvania New York Central Transportation Company.

14. Until otherwise relieved by this Commission, Pennsylvania New York Central Transportation Company shall retain its stock and other holdings to the degree now maintained in Lehigh Valley Railroad Company and render such support, financial and otherwise, as the Commission, from time to time, may determine necessary to keep such railroad operational. If at the end of ten years from the consummation of this transaction or such reasonable time as the Commission may determine, the inclusion of the Lehigh Valley Railroad Company in The Chesapeake and Ohio Railway

Company, its subsidiary and affiliates or in the Norfolk and Western Railway Company, its subsidiaries and affiliates has not been accomplished, and if after hearing, upon its own motion or upon a section 5 application, the Commission determines that inclusion of Lehigh Valley Railroad Company in the instant transaction, through merger or otherwise, is consistent with the public interest, the Commission shall order such inclusion upon such terms as may be found just and reasonable and such action shall be binding upon the Pennsylvania New York Central Transportation Company.

. . . . .

16. Consummation of the transaction approved herein shall constitute on the part of The Pennsylvania Railroad Company and the New York Central Railroad Company, their successors and assigns, acquiescence in and assent to the conditions stated in this appendix and in the attached report." 327 I.C.C. at 554–55.

**5.** Beginning in April, 1967, the then Pennsylvania Railroad began deferring collection of interline balances owed by the Lehigh Valley at the rate of almost $400,000 per month. After the merger, Penn Central also purchased at face value $2,460,000 in Lehigh Valley bonds which matured in 1969 and which the latter was unable to redeem.

U.S.C. § 723, if such an order would result in the inability of Lehigh Valley to meet its current operating expenses.[6] The trustees of the Lehigh Valley for their part petitioned to withdraw an earlier petition to effectuate a settlement, and asked the court for a determination with respect to the interline balance payments due Penn Central. Should the court order current payments to the Penn Central, the Lehigh Valley trustees also requested that the court direct them to apply for a § 213 grant.

■ The district court's opinion accompanying Order No. 226 rejected the binding effect of conditions 14 and 16 contained in Appendix "A" to the Commission's Report.[7] The district court concluded:

"The Interstate Commerce Commission has never entered any orders requiring Penn Central to provide support to the Lehigh Valley, and no one has ever sought such an order.

.     .     .     .     .

Whatever the nature of the obligation to absorb the Lehigh Valley which merger condition 14 may have imposed upon the Penn Central—absolute or contingent, enforceable by the Lehigh Valley or only by the Commission, cancelling or recognizing the interline debt—it is a pre-bankruptcy obligation. It is not binding upon the Penn Central Trustees unless they adopt it, and they certainly have not done so." 371 F.Supp. at 214–215.

In this holding the district court erred. The conditions imposed by the I.C.C. Report approving the merger were, as the Commission had said, inchoate only up to the time the merger was consummated. Thereafter, they had binding force. By consummating the merger in 1968, Penn Central subjected itself to action of the I.C.C. seeking to keep the Lehigh Valley alive and operational until it could be included in another system, merged into Penn Central or with the Commission's approval, abandoned.[8] The filing of the petitions for § 77 reorganization by the two railroads did not terminate this continuing liability of Penn Central which became a term of the franchise.

■ The reorganization court was without authority to vary the conditions of Penn Central's franchise. Only the appropriate regulatory agency could do so. Smith v. Hoboken R. R. Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946); Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93 (1939); In re Central Railroad Co., 485 F.2d 208 (3d Cir. 1973), cert. denied, 414 U.S. 1131, 94 S.Ct. 870, 38 L.Ed.2d 755 (1974). Trustees appointed under § 77 of the Bankruptcy Act are subject to the jurisdiction of the Commission, and a modification of condition 14 would have required application to that agency in addition to approval by the reorganization court. § 77(c)(2), 11 U.S.C. § 205(c)(2). Whether, since the enactment of the Regional Rail Reorganization Act of 1973, the Commission still has any authority to amend condition 14 pursuant to 49 U.S.C. § 5(9) is a question which on this record we do not reach. See § 601(b) of the Rail Reorganization Act, 45 U.S.C. § 791(b). It suffices to say that the district court misinterpreted the merger condition as a mere executory contractual undertaking which could be affirmed or disaffirmed by the Penn Central trustees regardless of the attitude of the Commission, and regardless of the possible effect on the formulation of a final system plan to be created under the Regional Rail Reorganization Act.[9] Nor does the happenstance that separate

---

6. In fact, the district court was to conclude that the Lehigh Valley would run out of cash in six months time if it were required to pay interline balances on a current basis to Penn Central. 371 F.Supp. at 216.

7. See note 4 *supra* for the text of these conditions.

8. See conditions in Note 4 *supra*.

9. Even in the absence of a continuing I.C.C. role, the Rail Reorganization Act appears to limit the authority of the district court under the Bankruptcy Act. See § 601(b), 45 U.S.C. § 791(b).

trustees were appointed for the parent and the subsidiary serve to alter the legal relationship resulting from the pre-reorganization decision by Penn Central to accept the merger conditions listed in Appendix "A" to the Commission's Report.

Order No. 226 adjudicated not only that the interline accounts should be paid currently, but also that the unpaid balances accrued from and after July 31, 1970 would be treated as administration claims against the Lehigh Valley estate. The latter adjudication is based upon the same misinterpretation of the effect of the merger conditions as affected the former. The Lehigh Valley trustees and indenture trustees contend that both the pre-reorganization and the post-reorganization interline balances should be subordinated to the claims of other creditors of the Lehigh Valley, if not totally disallowed as contributions to Lehigh Valley capital. *See* Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); Taylor v. Standard Gas & Electric Co., 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939); New York Trust Co. v. N. Y. & Greenwood Lake Ry. Co., 156 F.2d 701 (3d Cir. 1946).

Since Order No. 226 was entered because of a misapplication of the legal status of the merger conditions it must be vacated. It does not follow, however, that we should at this time adjudicate the application of the so-called "Deep Rock" doctrine to either the pre- or post-reorganization debts owed by the Lehigh Valley subsidiary to the Penn Central parent. In the first place, because the district court did not consider condition No. 14 to be legally binding on the reorganization trustees, it did not make findings of fact upon which we could predicate a decision as to the applicability of the "Deep Rock" rule. Moreover, on September 30, 1974 the Special Court created by § 209(b) of the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 719(b), has now held that both Penn Central and Lehigh Valley are railroads in reorganization under that Act rather than under § 77 of the Bankruptcy Act.

In re Penn Central Transportation Co., 384 F.Supp. 895 (Spec.Ct.1974).

Loan or grant assistance to keep both Lehigh Valley and Penn Central operational during the period necessary to formulate a final system plan presumably will be available pursuant to §§ 211, 213, and 215 of the Rail Reorganization Act, 45 U.S.C. §§ 721, 723, 725. Consequently it may well be that as of September 30, 1974, the obligation to keep the Lehigh Valley operational passed by operation of the Rail Act from the Penn Central's trustees to the federal government. If all or part of the Lehigh Valley is conveyed to the Consolidated Rail Corporation pursuant to § 303(b) of the Rail Act, 45 U.S.C. § 743(b), the total consideration must be "fair and equitable to the estate of [the] railroad in reorganization . . . .." § 303(c)(1)(A), 45 U.S.C. § 743(c)(1)(A). The Special Court must then make the determination whether the distribution is fair and equitable. § 303(c)(2), (3), (4), 45 U.S.C. § 743(c)(2), (3), (4). In doing so it will be obliged to consider the relative priorities of Penn Central and the other creditors of the Lehigh Valley in the latter's estate. It probably will also consider the contentions of the Lehigh Valley trustees and indenture trustees with respect to the applicability of the "Deep Rock" doctrine to pre- and post-reorganization Lehigh Valley debts. If it does not do so, later stages of the Lehigh Valley claims proceedings will afford the opportunity to litigate these contentions. Therefore consideration of these contentions by us at this time would certainly be premature, and in any event, may now be beyond the scope of our appellate jurisdiction under the Bankruptcy Act. 11 U.S.C. § 47. See §§ 209(b), 601(b) of the Rail Act, 45 U.S.C. §§ 719(b), 791(b).

Order No. 226 and Order No. 233 will be vacated, except for that directive which permits the trustees of the Lehigh Valley to apply for § 213 assistance. Such vacation will be without prejudice to the consideration by the district court of the appropriateness of some interim payments of interline balances in the

light of Penn Central's obligation to keep Lehigh Valley operational until the final system plan under the Rail Act has been devised, and the cash position of the Lehigh Valley in light of the interim operating assistance which may be available to both railroads under the various provisions of the Rail Act.