**GENERAL ELECTRIC COMPANY**

v.

**HOL-GAR MANUFACTURING CORP.**
**and Yardney Electric Corporation,**
**Garnishee.**

Civ. A. No. 75-781.

United States District Court,
E. D. Pennsylvania.

May 19, 1977.

Morris R. Brooke, Drinker Biddle & Reath, Philadelphia, Pa., for plaintiff.

Samuel L. Hirshland, Liebert, Short, Fitzpatrick & Levin, Philadelphia, Pa., for garnishee.

## OPINION

LUONGO, District Judge.

This is a diversity action[1] to determine who has superior rights to certain property. The matter is before me on a motion for summary judgment by garnishee, Yardney Electric Corporation (Yardney), under Federal Rule 56.

### Background and Procedural History

Hol-Gar Manufacturing Corporation was an independent corporation until 1969, when it was purchased by Whitaker Corporation and was made a division of Whitaker's subsidiary, Yardney. In late 1971, Yardney made it known that it wished to sell its Hol-Gar division. Henry Mancuso, Robert Gasparro, Herman Kessler, and Fred Gartner, former officers of the Hol-Gar Manufacturing Corporation, who had been retained after the corporation's purchase by Whitaker, negotiated to purchase the division. Mancuso, Gasparro, Kessler, and Gartner formed a new Hol-Gar Manufacturing Corporation (Hol-Gar), the defendant herein, in March 1972, each contributing $75,000 capital. On March 28, 1972, Hol-Gar purchased from Yardney all of the assets of Yardney's Hol-Gar division for $250,000 or $300,000 cash,[2] a $750,000 promissory note, 20% of outstanding Hol-Gar stock, and the assumption of certain liabilities pertaining to the Hol-Gar division. On that same date, Hol-Gar and Yardney entered into a security agreement whereby Yardney was given a security interest in all

of Hol-Gar's assets as collateral for the note. The agreement provided that if Hol-Gar defaulted on the note, Yardney could, inter alia, foreclose and take possession of all or part of the collateral and sell it. Yardney perfected the security interest by filing financing statements with the Delaware County Prothonotary and the Secretary of the Commonwealth in Harrisburg on April 3, 1972. As additional security the principals of the new Hol-Gar corporation pledged to Yardney their 80% of the Hol-Gar stock.

The new Hol-Gar corporation suffered financial losses. On June 24, 1974, plaintiff herein, General Electric Company (GE), which had been selling goods to Hol-Gar, suspended further deliveries because of nonpayment of invoices and Hol-Gar's failure to provide adequate assurance of due performance. On July 9, 1974, Yardney notified Hol-Gar that it was in default on its March 28, 1972 promissory note.

On September 23, 1974, GE instituted suit in this court (Civil Action No. 74–2469) to replevy the goods for which Hol-Gar had not paid. On the following day the United States Marshal seized on Hol-Gar's premises, and tagged, certain goods with a claimed value of $450,913.85. On January 2, 1975, GE and Hol-Gar entered into a settlement agreement as to the replevin action under the terms of which Hol-Gar promised to pay GE $445,356.19 plus an additional amount left open to negotiation. The agreement provided that Hol-Gar would make an initial payment of $140,000 by March 15, 1975,[3] with the balance payable in $50,000 monthly installments, with authorization to GE to enter judgment by confession in the event of Hol-Gar's default.

1. The complaint alleges that plaintiff General Electric Company is a New York corporation with its principal place of business in New York and that defendant Hol-Gar Manufacturing Corp. is a Pennsylvania corporation with its principal place of business in Pennsylvania. The amount in controversy exceeds $10,000.

2. In an affidavit, Mancuso states that Hol-Gar paid $250,000 cash, but in a deposition (Doc. No. 23, at 9–10) Mancuso testified that he is

unsure whether the cash paid was $250,000 or $300,000.

3. Hol-Gar agreed to pay the $140,000 "[w]ithin forty-five (45) days following the issuance of the Memorandum of Decision of the Air Force Contract Adjustment Board on Hol-Gar's pending petition before such Board." The parties agree that the date by which Hol-Gar was to make payment was March 15, 1975.

On January 28, 1975, Yardney, acting on Hol-Gar's mid-1974 default, took possession of the property covered by its security interest, seizing all Hol-Gar assets in accordance with the security agreement. At the same time Yardney exercised its rights in the stock pledged by the principals. Notices of the seizure of the Hol-Gar assets were placed on the premises, the locks were changed, the Hol-Gar officers were asked to resign and sign proxies for their stock, and Yardney personnel took inventory of all assets. On February 24, 1975, Yardney informed Hol-Gar of its intention to sell the collateral to International Fastener Research Corporation (Fastener). The agreement of sale to Fastener was signed on March 26, 1975, although Yardney retained possession for an additional two months. The sale price, $475,000, did not fully compensate Yardney for the balance remaining due on the note.

In the meantime, Hol-Gar had defaulted on the $140,000 initial payment due on March 15, 1975 under its settlement agreement with GE. Two days later, GE instituted the instant action by entering a confession of judgment against Hol-Gar in the amount of $140,000. On April 4, 1975, GE obtained judgment by default in the replevin suit (Civil Action No. 74–2469) in the amount of $310,913.85, i. e., the value of the goods originally claimed by GE in that action minus the $140,000 judgment by con-

fession awarded GE in this action. Also on April 4, GE obtained a writ of execution directing the United States Marshal to levy on "[a]ll property, real and personal, of Hol-Gar Manufacturing Corporation" on Hol-Gar's premises and to attach all of Hol-Gar's property in the possession of Yardney as garnishee. In accordance with Pennsylvania rules on enforcement of money judgments, GE served Yardney with "Interrogatories in Attachment." [4] On April 11, a United States Marshal levied on the Hol-Gar property and attached the property in Yardney's possession.

On May 14, 1975, GE and Yardney entered into an agreement under which GE released its claims to the Yardney collateral, thus allowing it to be sold, with the understanding that the parties would litigate who had superior rights to the collateral.[5] Yardney agreed to post a bond in the amount of $475,000 to cover payment to GE of any amount to which GE might be adjudged entitled. On May 23, 1975, Yardney delivered the collateral to Fastener in consummation of the March 26 sale.[6]

Yardney answered GE's Interrogatories in Attachment on November 10, 1975, stating that it did not have any Hol-Gar property in its possession, pleading as "New Matter" that the attachment should be dissolved because of Yardney's superior rights to the collateral by reason of the security

---

**4.** Federal Rule of Civil Procedure 69(a) provides:

"Process to enforce a judgment for the payment of money shall be a writ of execution, unless the court directs otherwise. The procedure on execution, in proceedings supplementary to and in aid of a judgment, and in proceedings on and in aid of execution shall be in accordance with the practice and procedure of the state in which the district court is held, existing at the time the remedy is sought, except that any statute of the United States governs to the extent that it is applicable."

Since there is no applicable federal statute, GE followed Pennsylvania procedural rules. Those rules provide for attachment by service of a writ of execution. Pa.R.Civ.P. 3102 et seq. The writ may be accompanied by interrogatories directed to the garnishee respecting the property of the defendant in the garnishee's possession. Pa.R.Civ.P. 3144. The interroga-

tories are the equivalent of a complaint in an assumpsit action. Pa.R.Civ.P. 3145(a).

**5.** Paragraph 7 of the agreement provides:

"It is understood and agreed that the term 'collateral' as used herein does not include . . . property of Hol-Gar which was subject to a replevin action by GE filed September 24, 1974, at Civil Action No. 74–2469, and further, that GE is not, by this Agreement, releasing any claim with respect thereto." The instant suit, which is being conducted pursuant to the May 14 agreement, therefore is not concerned with goods subject to replevin by GE.

**6.** Fastener had sold part of the collateral to Pavid Manufacturing Co. on March 31, 1975. Fastener has informed the Court that it intends to sell the rest of the collateral, and Fastener and Pavid have petitioned the Court to set aside plaintiff's levy on the collateral.

agreement.[7] GE replied to the New Matter on December 10, denying "knowledge or information sufficient to form a belief" as to Yardney's averments. Yardney then moved for summary judgment on the record consisting of affidavits and depositions submitted by GE and Yardney.

### Discussion

■ To prevail on a motion for summary judgment, Yardney must establish "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The motion "may not be granted where there is the slightest doubt as to the facts." *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir. 1974). The facts must be viewed in a light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). However, when the motion is supported by affidavits, the opposing party must respond with evidence setting forth specific facts showing that there is a genuine issue for trial; he may not rely on the allegations in his pleading. Fed.R.Civ.P. 56(e); *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.), *cert. denied*, 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

■ The uncontradicted evidence in the affidavits and depositions establishes that Yardney perfected its security interest in

*most*[8] of Hol-Gar's assets by filing financing statements with the Delaware County Prothonotary and the Secretary of the Commonwealth on April 3, 1972, and in *all* of the Hol-Gar assets by taking possession thereof on January 28, 1975. *See* Uniform Commercial Code (UCC) §§ 9–302, 9–305, 9–401 *et seq.*, 12A P.S. §§ 9–302, 9–305, 9–401 *et seq. See also id.* § 9–303(2), 12A P.S. § 9–303(2). GE did not acquire an interest in the property until April 11, 1975, when it executed on its judgment in this action and became a lien creditor under UCC § 9–301(3), 12A P.S. § 9–301(3). Yardney therefore correctly argues that, since it had a prior perfected security interest in the collateral, it had superior rights to the Hol-Gar assets. *See* UCC §§ 9–301(1), 9–312, 12A P.S. §§ 9–301(1), 9–312; *Massachusetts Mutual Life Ins. Co. v. Central Penn National Bank*, 372 F.Supp. 1027, 1042 (E.D.Pa.1974), *aff'd mem.*, 510 F.2d 970 (3d Cir. 1975). Under UCC § 9–504(1), 12A P.S. § 9–504(1), Yardney was entitled to sell the collateral to Fastener, and, since the sale proceeds from Fastener did not fully satisfy the debt owed to Yardney by Hol-Gar, Yardney was entitled to keep all of the sale proceeds for itself.

In opposing summary judgment, GE contends that, even if Yardney held a prior perfected security interest, GE should be accorded superior rights under the doctrine of equitable subordination.[9] The doctrine of equitable subordination is a rule of bankruptcy law and derives from *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939), and *Pepper v.*

---

7. Under the Pennsylvania Rules, a garnishee's answer to interrogatories is equivalent to an answer in an assumpsit action. Pa.R.Civ.P. 3145(a). The answer may include as "new matter" defenses of immunity or exemption of the property; any defense or counterclaim which could be asserted against the defendant judgment debtor; or any claim which could be asserted against the plaintiff garnishor. Pa.R. Civ.P. 3145(b).

8. GE contends that Yardney's security interest in those Hol-Gar assets that were fixtures was not perfected on April 3, 1972 because Yardney did not file a financing statement in the Recorder of Deeds' office pursuant to Uniform Com-

mercial Code § 9–401(1)(b), 12A P.S. § 9–401(1)(b). Yardney concedes the validity of this argument as to some of the fixtures but argues that filing with the Recorder of Deeds was not required as to most fixtures because they were attached to leased premises. It is unnecessary to explore the ramifications of this issue in view of Yardney's perfection through possession on January 28, 1975.

9. The UCC provides that it shall be supplemented by equitable principles, including "the law relative to . . . estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause." UCC § 1–103, 12A P.S. § 1–103.

*Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). *Taylor* was a case in which a parent corporation had retained complete control of its subsidiary; had grossly mismanaged the subsidiary's affairs while accumulating huge debts to itself; and, to prevent the subsidiary's preferred shareholders from gaining voting rights, had forced payment of dividends to those shareholders while the subsidiary was in a precarious financial condition. The Supreme Court held that, under those facts, the debts owed to the parent corporation were required to be subordinated to the interests of the preferred shareholders in a reorganization of the subsidiary under the Bankruptcy Act. In *Pepper,* the Court held that under the facts of that case the bankruptcy court had a "duty" (308 U.S. at 312, 60 S.Ct. 238) to subordinate the claims asserted by a "dominant and controlling stockholder" (*id.* at 296, 60 S.Ct. 238) against the corporation which he controlled. The stockholder had accumulated unpaid salary claims against the corporation in amounts fixed by himself and entered judgments by confession on those claims at a time when the corporation was in financial trouble. The stockholder caused the corporation to obtain suspension of execution on another creditor's judgment against the corporation to give himself time to levy on corporate property and make the property unavailable to the other creditor. He then caused the corporation to go into bankruptcy to avoid the other creditor's claims. The *Taylor* and *Pepper* decisions were based on the equitable powers of bankruptcy courts.

■ The facts in the instant case differ materially from those of *Taylor* and *Pepper.* First, this is not a bankruptcy case, and I am aware of no case applying the equitable subordination doctrine in a non-bankruptcy situation. Second, Yardney was neither Hol-Gar's parent corporation, as was the creditor in *Taylor,* nor Hol-Gar's dominant or controlling shareholder, as was the case in *Pepper.* Yardney owned only 20% of Hol-Gar's stock. The evidence is uncontroverted that Hol-Gar never voted those shares, had no representative on Hol-Gar's Board of Directors, and did not participate in the daily management of Hol-Gar's affairs in any way. GE has cited no authority, and independent research has disclosed none, to support application of the doctrine of equitable subordination in the absence of the close relationship between creditor and debtor exemplified in *Taylor* and *Pepper.*[10] *See also, e. g., Comstock v. Group of Institutional Investors,* 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948); *In re Calpa Products Co.,* 249 F.Supp. 71 (E.D.Pa.), *aff'd per curiam,* 354 F.2d 1002 (3d Cir. 1965), *cert. denied sub nom., Grasberger v. Calissi,* 383 U.S. 947, 86 S.Ct. 1204, 16 L.Ed.2d 209 (1966). Since the record discloses no genuine issue of fact as to the existence of such a close relationship, as a matter of law the doctrine cannot be applied.

■ Furthermore, even if equitable subordination were applicable to this type of case, there is no evidence of inequitable conduct by Yardney which justifies subordination of Yardney's claim. GE contends that there is a genuine issue of fact relating to its claim of equitable subordination in that Yardney participated in the formation of Hol-Gar as a drastically undercapitalized corporation in a scheme to defraud Hol-Gar's creditors. A party must plead the circumstances underlying an averment of fraud with particularity, however. Fed.R. Civ.P. 9(b). This requirement takes on spe-

10. In addition to *Taylor* and *Pepper,* GE relies on *In re Credit Industrial Corp.,* 366 F.2d 402 (2d Cir. 1966), and *Law v. Fuller,* 217 Pa. 439, 66 A. 754 (1907) (per curiam). In the former case, the Court of Appeals held that the district court had erred in applying equitable rules to disavow a contractual subordination agreement. *See* 366 F.2d at 407–10. The court mentioned equitable subordination only to contrast that doctrine with contractual subordination. *See id.* at 408–09. In the latter case, the Pennsylvania Supreme Court adopted an opinion of the Lackawanna County Court of Common Pleas which stated, inter alia, that a corporate director could only assert a debt against the corporation if he had acted in "entire good faith." 217 Pa. at 440, 66 A. at 754. Neither the Supreme Court nor the Court of Common Pleas ever mentioned equitable subordination. GE's citation to 3 Collier on Bankruptcy ¶ 57.14 at 230–31 also fails to add support to its theory.

cial significance in light of the rule, discussed above, that once a motion for summary judgment is made the opposing party must counter with specific facts showing a genuine issue for trial (Fed.R.Civ.P. 56(e)). There are no facts to support GE's fraudulent undercapitalization theory.

GE relies primarily on the affidavit of a certified public accountant who reviewed Hol-Gar's financial statements and records. For purposes of this motion, Yardney has admitted the facts set forth in the accountant's affidavit. The affiant states that:

"a. Generally accepted accounting principles require that inventories be stated at the lower of cost or market and that adequate allowances be made for obsolete, slow-moving, or unsaleable inventories. It does not appear that adequate valuation reserves were recorded on the financial statements of Yardney's Hol-Gar Manufacturing Division (hereinafter 'Hol-Gar Division') and Hol-Gar.

b. Certain inventory reserves were reflected on the pro forma Balance Sheet dated January 2, 1972, for Yardney's Hol-Gar Division, but such reserves do not appear on the balance sheet of Hol-Gar after the transfer of assets. Such reserves exceeded Hol-Gar's Shareholders' equity on March 28, 1972, by an amount in excess of $200,000.00.

c. Hol-Gar's audited financial statements indicate that on March 31, 1974, Hol-Gar's liabilities exceeded its total assets by $365,262.00.

d. During the period January through March, 1972, accounts payable of Hol-Gar Division increased by $321,000 indicating that Yardney was deferring payment of its current obligations.

e. The current financial obligations of Hol-Gar on April 1, 1972, including the accounts payable assumed from Hol-Gar Division of Yardney, exceeded its liquid assets (cash and receivables) by $496,-000.00, and this necessitated borrowings of $290,000.00 in that month, to discharge certain of its obligations. Hol-Gar never created a cash flow to enable it simultaneously to retire its April 1972 borrowings (which instead increased) and also meet its other obligations as they matured.

f. On the basis of Yardney's own forecasts, the capitalization of Hol-Gar and particularly its debt to Yardney rendered the survival of Hol-Gar as an operating business dependent on Yardney's either indefinitely subordinating its security interest in favor of a financing institution or itself investing further in Hol-Gar Mfg. Corp."

GE contends that this financial data, coupled with Yardney's ownership of 20% of Hol-Gar's stock and its security interest in the remaining stock and all of Hol-Gar's assets, discloses a scheme by Yardney to defraud Hol-Gar's subsequent creditors, requiring subordination of Yardney's claims.

Accepting all the statements in the accountant's affidavit as true, as I must, I conclude that the facts submitted by GE are not sufficient to create a material issue of fact as to Yardney's fraudulent participation in Hol-Gar's undercapitalization. Only items (a), (d), and (f) in the affidavit reviewing Hol-Gar's financial status relate to Yardney. As to item (a)—adequacy of the inventory reserves recorded on the financial statements of Yardney's Hol-Gar division—the affiant's statement that the recorded reserves were inadequate is at best equivocal. Construing it favorably to GE, the item does not evidence fraudulent conduct by Yardney. The extent to which the recorded reserves were "inadequate" is nowhere detailed, nor is there a hint as to the reasons for the "inadequacy". For all that appears, the "inadequacy" may represent a difference between accountants in the interpretation of "generally accepted accounting principles." Something more is required to create a genuine issue of fact as to whether Yardney recorded inadequate reserves for the purpose of defrauding Hol-Gar's creditors. GE's argument that the "inadequacy" was an element of Yardney's fraud is based on nothing more than speculation, and without factual support it could not form the basis for subordination of Yardney's claim.

Item (d)—increase of the accounts payable of Yardney's Hol-Gar division in early 1972—appears to be completely irrelevant. Accepting as fact that this does indicate that Yardney was deferring payment of the division's current obligations, it means simply that Yardney conserved whatever assets (cash or inventory) of the division would have been used for payment of the current obligations, i. e., current assets and current liabilities were affected equally. · Since the division's current, as well as overall, assets and liabilities were reflected on the balance sheet, it is hard to imagine how this could have been used to perpetrate a fraud. There is no evidence that the price paid for the division by Hol-Gar was not based on the financial status of the division at the time of purchase.

Item (f)—projected need for indefinite subordination of Yardney's security interest in favor of financing institutions or for further investment in Hol-Gar by Yardney—merely underscores another undisputed fact: the Hol-Gar division had not been profitable under Yardney's operation and faced considerable difficulties as an independent entity. As the owner of the Hol-Gar division, it is not surprising that Yardney foresaw the cash needs that the new Hol-Gar would face. Such foresight certainly does not equate with fraud. Yardney's apparent willingness to subordinate its security interest to financing institutions only demonstrates sound business practice. Under § G of the March 28, 1972 security agreement, Yardney agreed to subordinate its security interest to that of any financial institution providing funds, and this provision furnished the means of infusing new funds into Hol-Gar by making banks more willing to lend to it. The fact that Hol-Gar did not become profitable despite this provision is no evidence that Yardney acted in bad faith.

The evidence discloses nothing more than that Yardney disposed of an apparently unprofitable division to a new corporation in an arm's length transaction and that it accepted a minority stock interest in the new corporation and a secured note as part of the purchase price. There is no genuine issue of fact as to GE's theory that Yardney participated in Hol-Gar's undercapitalization to defraud Hol-Gar's creditors.

██ GE has also sought to draw inferences of fraud from the chronology of events in this case. GE points out that, although Yardney declared Hol-Gar in default in early July 1974, Yardney did not exercise its rights in the collateral for six months, during which time Hol-Gar negotiated and entered into the settlement agreement with GE. It is difficult to understand how this conduct could be fraudulent, since at all times Yardney acted in accordance with the security agreement and since GE should have been on notice of at least a substantial portion of that agreement as a result of the financing statements filed by Yardney with the Delaware County Prothonotary and the Secretary of the Commonwealth. Be that as it may, GE has presented nothing to support its suspicion that Yardney deliberately waited until the settlement agreement was signed before taking possession of the collateral. Indeed, GE has presented no evidence that Yardney even knew of the settlement negotiations with plaintiff. See Deposition of H. Mancuso, Doc. No. 23, at 27–30; Deposition of R. J. Gasparro, Doc. No. 24, at 71–75. The uncontroverted fact is that Yardney deferred foreclosure to give Hol-Gar an opportunity to renegotiate certain government contracts and thereby ease its financial problems, an effort which failed in December 1974. See Mancuso Deposition, supra, at 30–31; Gasparro Deposition, supra, at 68–69.

In sum, GE has presented no evidence that Yardney has been engaged in such fraudulent, unconscionable, or inequitable conduct as to deprive it of its superior entitlement to the Hol-Gar collateral. Satisfied that there are no genuine issues of material fact and that Yardney is entitled to judgment as a matter of law, an order will be entered granting Yardney's motion for summary judgment.